**UNITED STATES FIDELITY &
GUARANTY CO. et al.**

v.

**The UNITED STATES.**

No. 183–70.

United States Court of Claims.

March 16, 1973.

Peter J. Gagne, Boston, Mass., for plaintiffs. Samuel H. Cohen, Boston, Mass., attorney of record for plaintiffs.

Leslie H. Wiesenfelder, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND ON DEFENDANT'S MOTION TO DISMISS ALL PLAINTIFFS BUT THE SURETY

BENNETT, Judge.

Plaintiff USF&G was a Miller Act[1] surety on contract No. NBy–58920 in which Premier Contractors, Inc., the prime contractor, had agreed to make modifications to building No. 36, Barracks and Mess, at the United States Naval Station, Boston, Massachusetts. The contract was awarded on February 10, 1965, on a bid of $255,204. The plaintiff executed a payment bond in the amount of $127,602 and a performance bond in the amount of $255,204 on that same day. The prime contractor entered

---

1. 40 U.S.C. §§ 270a–270e (1964).

into performance of the contract and began to encounter financial difficulties soon thereafter.

By the summer of 1965, several of the subcontractors had begun to complain verbally of nonpayment of bills by the prime. These complaints were soon formalized by the filing of notices of nonpayment with the surety. Thus, the surety knew at this point that the prime contractor was not properly paying the labor and material obligations being generated under the contract.

By September 27, 1965, the Government had made six progress payments to the prime contractor, totaling $182,000. Just prior to the preparation of the seventh progress payment, the surety, on December 3, 1965, sent the contracting officer two telegrams notifying him that the prime had not made the proper payments to the laborers and suppliers and was, therefore, in default on the subject contract and demanding that the Government refrain from making any further progress payments to the prime contractor.

On that same day, the Navy representative telephoned the agent of the surety and notified him that there was insufficient basis on which to warrant the stopping of further progress payments to the prime, and that the work on the site was progressing and was expected to be completed shortly. A telegram to this effect was sent to confirm the telephone conversation. Thereafter, on December 8, 1965, the seventh progress payment was made to the prime contractor for $29,000.

On December 9, 1965, the Navy sent the surety a letter notifying it that the Government did not consider the prime to be in default on the contract, and that the nonpayment of bills was considered a matter between the surety and the prime. The surety responded on December 17, 1965, in a letter in which it reaffirmed its demand that no further payments be made to Premier and advising the contracting officer that it had notice of unpaid bills in excess of its liability on the payment bond, including three lawsuits filed by the subcontractors against Premier and the plaintiff-surety.

Approximately 3 weeks later, on January 10, 1966, the Navy notified the prime contractor that it would make no further progress payments until it could be shown that the Government would not sustain liability to subcontractors. Premier was likewise informed that its progress was now considered unsatisfactory and unless this was remedied by January 17, 1966, the contract would be closed out by a deductive change order with new contracts to be let in order to finish the project. This action would serve effectively to terminate the contract.

Premier responded to this letter by informing the Government that without further progress payments it would be unable to complete the contract. The surety likewise told the Navy that in the event of a default by the prime it would not complete the project, risking possible liability under its performance bond.

Following the receipt of these letters, the Navy on January 18, 1966, issued a change order deleting the work yet to be finished on the project, thereby reducing the total contract price by some $18,585. At the same time, the Navy entered into direct contracts with several of the subcontractors to finish the work on the project at a cost approximately the same as that saved by canceling the contract with Premier. Thus, the surety suffered no liability on the performance bond.

On January 16, 1966, the plaintiff-surety filed a suit in interpleader in the District Court of Massachusetts (Civ. Action No. 66–175–C) in which it deposited $127,602, the limit of its obligation under the payment bond. This amount was used to pay, on a pro rata basis, $165,090 in unpaid bills, plus interest. The difference was not paid by the surety and has not been paid by Premier.

On January 3, 1967, the Internal Revenue Service (IRS) served the Navy

with a notice of a levy of $7,946.78 for taxes owed by the contractor. This amount was paid by the Navy out of funds still unexpended under the contract.

As the case comes before the court, it is in a somewhat unusual form. The original petition was filed by the plaintiff-surety joining all 23 subcontractor laborers and materialmen with unpaid claims as co-plaintiffs. In the petition, United States Fidelity & Guaranty Co. claimed that the $29,000 progress payment made December 8, 1965, by the Navy was improper since the surety had given the Navy adequate notice of the unpaid bills. Therefore, payment to the prime, despite this notice was urged as violation of the surety's right of subrogation. The surety likewise contended that the payment to the IRS of the portion of the funds unexpended under the contract was improper since either the surety or the subcontractors had a prior right to those funds ahead of the IRS. The surety also claimed that there was approximately $25,000 left unexpended under the contract to which it or the subcontractors have a prior right. In its answer, the Government asserted that the amount unexpended under the contract was only $4,445.22 after the tax levy and liquidated damages were deducted. This contention has not been refuted by the plaintiffs and has apparently been accepted as true by them since that time.

The Government's initial response to this suit was the filing of a motion to dismiss all the plaintiffs but the surety for lack of standing to sue. This court subsequently suspended action on the motion until the surety's claim was disposed of by the court. This issue must now be dealt with along with the merits of the various claims raised by the plaintiffs.

The Government has also filed a contingent cross-claim against the third-party contractor (Premier), should it be found liable with respect to the making

of the December 8, 1965 progress payment.

The claims presented by the plaintiffs divide into three distinct issues. First, the court must decide if the $29,000 progress payment made over the surety's protest was proper or a violation of the surety's right of subrogation. Second, the court must consider the relative priorities between the plaintiffs and defendant with respect to the $7,946.78 paid by the Navy to the IRS to cover tax obligations owed by the prime contractor. Finally, the court must decide which of the parties has a prior right to the $4,445.22 still held by the defendant and unexpended under the contract. This issue really concerns the measure of the rights subcontractors have to assert an equitable claim against the United States, and is linked closely to the issue raised by the Government's motion to dismiss the subcontractors for not having standing to sue at all. This last issue will be dealt with first.

■■ The Government in its briefs and on oral argument has conceded that the $4,445 still unexpended under the subject contract is not its to keep. The United States clearly has no further interest under the contract. The buildings are complete and all the pertinent debts owed by the contractor to the Government in the way of taxes have been paid. In this position, the defendant is merely a stakeholder of the retained fund. The issue is, quite simply, to whom should the Government pay this fund? The fund would ordinarily be owed to the prime contractor had it paid all of its obligations to the subcontractors, but when the Government is in the position of a stakeholder, it is not free simply to pay the contractor when the surety has given adequate notice of other competing claims to the fund. Fireman's Fund Ins. Co. v. United States, 421 F.2d 706, 190 Ct.Cl. 804 (1970); Home Indem. Co. v. United States, 376 F.2d 890, 180 Ct.Cl. 173 (1967); Newark Ins. Co. v. United States, 169 F. Supp. 955, 144 Ct.Cl. 655 (1959). The

Government in this situation must ordinarily await a judicial determination or an agreement between the parties before it may safely pay a contested amount.

██ Under the facts in this case, it is also quite clear that the surety has no claim of priority to the fund unexpended under this contract. Even though the surety was not required to make any payments on its performance bond, it did deposit the full value of its payment bond in the Massachusetts District Court. As it turned out, the payment bond was insufficient to cover all of the subcontractors' claims, so there still remains $43,657.57 in debts incurred by the prime contractor which were not and have not been paid. In North Denver Bank v. United States, 432 F.2d 466, 193 Ct.Cl. 225 (1970), this court followed the rule laid down in American Sur. Co. v. Westinghouse Elec. Mfg. Co., 296 U.S. 133, 56 S.Ct. 9, 80 L.Ed. 105 (1935), in which it was held that the surety was required to show that it had fully paid the claims of the laborers and materialmen arising out of the contract before it could share in the unexpended sums retained under the contract. See also, National Union Fire Ins. Co. v. United States, 304 F.2d 465, 157 Ct.Cl. 696 (1962). The North Denver Bank case with the rule it follows is clearly applicable to this surety with respect to the $4,445 amount still in the Government's hands. Until this surety undertakes to pay all of the outstanding claims owed by Premier, it will not be permitted to share in retainages still held by the Government.

██ The more difficult issue concerns the rights of the laborers and materialmen. Clearly, they are entitled to this fund on the equities, but the troublesome issue is whether they actually have standing to sue for the amount in this court. It has long been the rule that "laborers and materialmen do not have enforceable rights against the United States for their compensation." United States v. Munsey Trust Co., 332 U.S. 234, 241, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947). As a result, laborers and materialmen do not acquire liens on the Government buildings or property to which they have contributed. In recognition of this fact, the Miller Act and its predecessors were passed in order to protect the laborers and suppliers in situations in which the prime contractor fails to meet his obligations. Continental Cas. Co. v. United States, 164 Ct.Cl. 160, 163 (1964). At the same time, the Court has recognized that the Government does owe the subcontractors an equitable obligation to see that they are paid, and to the extent the surety pays these subcontractors the Government is released from this equitable obligation. Henningsen v. United States Fidelity & Guar. Co., 208 U.S. 404, 410, 28 S.Ct. 389, 52 L.Ed. 547 (1908).

In order to define precisely the rights of each of the parties in this case, two leading cases, United States v. Munsey Trust Co., supra, and Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), which reaffirmed Henningsen, must be examined further. In Munsey the issue was whether the United States or a payment bond surety had superior right to retained funds held by the Government. The Comptroller General was asserting priority to collect excess reprocurement costs owed by the contractor ahead of the surety. In the process of holding for the Government, the Court based its opinion in part on the fact that laborers and materialmen had no assertible rights against the Government to which the surety could be subrogated. In Pearlman the contest again involved priority to the retained fund, but this time the parties were the contractor's trustee in bankruptcy and a Miller Act surety. In holding for the surety, the Court followed Henningsen and said:

> We therefore hold * * * that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have be-

come entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. [371 U.S. at 141, 83 S.Ct. at 237]

Thus, by subrogation the surety obtained superior rights to the retained funds. There is, however, a problem in reconciling *Munsey* and *Pearlman* with respect to their discussions of the measure of the rights of the laborers and materialmen, even though the cases stand side-by-side. It is a short step from *Pearlman* to infer that if the subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly, which is in complete conflict with the language in *Munsey*, as recognized by Justice Clark's concurring opinion in *Pearlman*.

The dilemma may be resolved in a number of ways, but the most apparent might be by noting that the Court in *Pearlman* stated that the surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant. If this interpretation of *Pearlman* is adopted then *Munsey* is in complete harmony with it and the *Pearlman* decision is of no aid to these subcontractors. This conclusion likewise follows our decision in Continental Cas. Co. v.

United States, supra, in which we stated:

* * * The United States had the right to use the money in its hands to pay laborers and materialmen (Pearlman v. Reliance Insurance Company, 371 U.S. 132 [83 S.Ct. 232, 9 L.Ed.2d 190] (1962); National Surety Corp. v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724 (1955)), but the laborers and materialmen could not force it to do so. [Citing *Munsey Trust*.]." [164 Ct.Cl. at 162.]

Closely linked to this view is the fact that in all the cases touching on this issue the rights of the various parties have been defined in situations in which the issue is one of priority between competing interests in the fund held by the Government.[2] None have involved a plaintiff-subcontractor directly asserting a claim to money held by the Government. The subcontractors do possess equitable rights to the retained funds vis-à-vis other claimants to the money, but their rights cited by the courts in deciding, for example, that a surety who pays the subcontractors on a contract has priority via subrogation to the retained funds over an assignee of the prime contractor, do not necessarily include or imply a right in the subcontractor itself to sue the Government. The language that has been used by the courts in this respect is broad, but not so broad as to open a whole new area of litigation to parties that have consistently been found to have no standing to sue the United States. For this reason the court declines to grant the subcontractors' standing to sue for the amount retained by the Government under the contract.

The plaintiff-subcontractors contend that if they are not allowed to bring suit

2. Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); Henningsen v. United States Fidelity & Guar. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); In re Dutcher Constr. Corp., 378 F.2d 866 (2d Cir. 1967); Barrett v. United States, 367 F.2d 834, 177 Ct.Cl. 380 (1966); National Sur. Corp. v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724 cert. denied, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955).

and the surety is likewise unable to claim the fund since it has not paid all of the contractor's outstanding debts under this contract, then no one will be able to claim the money, which would permit the Government to retain both the benefits of the contract and the funds that were to be used to pay for them. This certainly looks like a windfall at the expense of the uncompensated subcontractors, but this is not necessarily the case. Had this contractor been declared bankrupt, his trustee would have a valid claim to the unexpended funds to which the subcontractors would then have a claim. There also appears to be nothing to prevent the Navy in this case from filing an action in interpleader by depositing the unexpended fund in a District Court. Since there has already been an adjudication on this matter in the District Court of Massachusetts in which it was found that the prime contractor (Premier) did in fact still owe the plaintiffs in this case $43,697.57, plus interest, the distribution pro rata of the unexpended contract fund would be little more than a formality, whether done by the District Court itself or by the Navy direct.

■ There is still further reason for the court to find that the plaintiff-subcontractors do not have standing in this case. The claim of the subcontractors is a debt owed them by the prime contractor, not the defendant. The plaintiffs seek to make this court a means of collecting this debt thereby embroiling it in the controversy between those parties. The bar to allowing direct subcontractor suits against the Government is aimed at preventing precisely this type of problem, particularly where there are alternative means of getting the money from the Treasury to the plaintiffs. In an effort to dispose of this problem once and for all, this court recommends that the Navy simply pay the contesting laborers and materialmen according to the pro rata division employed by the Massachusetts District Court or file an action in interpleader in that or another appropriate court (28 U.S.C. §§ 1335,

1397, 2361; F.R.Civ.P. 22) in order to see to it that the Government does not retain possession of funds to which the subcontractors have an equitable claim. This court has recommended before that when the Government is a stakeholder it should resort to the interpleader procedure. Newark Ins. Co. v. United States, 169 F.Supp. 955, 957, 144 Ct.Cl. 655, 658 (1959).

Plaintiffs' cross-motion for partial summary judgment is denied as to this issue and defendant's motion is granted.

The second important issue raised by the plaintiff-surety questions the defendant's right to collect a tax obligation of the prime contractor out of the unexpended funds under the contract ahead of the other creditors of the prime contractor, including itself and the subcontractors.

■ This matter was most recently handled by the court in Aetna Ins. Co. v. United States, 456 F.2d 773, 197 Ct. Cl. 713 (1972), in which the rule originally expressed in United States v. Munsey Trust Co., *supra*, was followed. A surety that pays on a performance bond in order to complete the subject contract has priority over the United States to the retainages in its hands. A surety that pays on its payment bond, however, does not have priority when the United States is asserting a tax or other obligation owed by the prime contractor. Since the surety in this case paid only on its payment bond, it falls in the latter category, and must claim the retainage subject to the tax claim of the United States. *See*, Trinity Universal Ins. Co. v. United States, 382 F.2d 317 (5th Cir. 1967), cert denied, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968); Barrett v. United States, 367 F.2d 834, 177 Ct.Cl. 380 (1966).

The plaintiffs' attorney has also strongly urged that whereas the surety may not have priority to the retained contract fund ahead of the IRS, the subcontractors should have priority. This of course may be disposed of by finding that the subcontractors do not have

standing to sue for this amount, but even if they did it would not appear to alter the result. The policy behind the decision in United States v. Munsey Trust Co., *supra*, which denied priority to a surety to retained contract funds in the face of a claim asserted by the Government, likewise applies to these subcontractors. The United States stands in the same position as any general creditor. "He is not compelled to lessen his own chance of recovering what is due him by setting up a fund undiminished by his claim, so that others may share it with him. In fact, he is the best secured of creditors; his security is his own justified refusal to pay what he owes until he is paid what is due him." 332 U.S. at 240, 67 S.Ct. at 1602. Though the subcontractors may have an equitable right to the retained funds, their claim to it, like the surety's, is subservient to the tax lien of the United States.

For the reasons given, the defendant's motion for summary judgment with respect to this issue is granted.

 The final issue to be discussed concerns the claim that the progress payment made by the Navy to Premier on December 8, 1965, over the surety's protest was improper and a violation of the surety's right of subrogation. The plaintiff cites numerous cases in which the payment of a contract sum over a surety's protest has resulted in liability on the part of the Government.[3] There is a critical difference however, which distinguishes those cases from the one presently at issue, and that is the fact that at the time this surety notified the contracting officer that the contractor was not paying his bills, the contract was still in operation with the project not yet complete. In the cases cited by the plaintiff, the work under the contract was complete and the issue centered on who should receive the final payment. In other words the Government in those cases was merely a stakeholder, its interest being satisfied once the project was completed.

The case with which we are now concerned involves the Government's receiving a notice to stop payments to a contractor who was still performing under the contract. The United States in this situation is primarily concerned with completion of performance under the contract and is far from being a simple stakeholder. It was this distinction which led the court in Argonaut Ins. Co. v. United States, 434 F.2d 1362, 193 Ct. Cl. 483 (1970), involving facts similar to those presented in this case, to reject the surety's argument that once the surety notified the defendant of the contractor's failure to meet its obligations the Government was under a legal obligation to stop making payments which were inconsistent with the surety's rights. The court said:

> * * * to hold the Government liable to plaintiff under the circumstances in this case grants the payment bond surety economic control of both the decision to terminate and the completion of the contract. [434 F.2d at 1367, 193 Ct.Cl. at 492.]

Thus, where the Government representative is notified of the contractor's nonpayment of obligations during the performance of the contract, the representative is faced with the task of balancing the Government's interests in proceeding with the contract, against possible harm to the surety. The court in *Argonaut* stated that: "During the performance of the contract, the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." 434 F.2d at 1368, 193 Ct.Cl. at 495. The key question then becomes whether the Navy's contracting officer did in fact re-

---

3. Firemen's Fund Ins. Co. v. United States, 421 F.2d 706, 190 Ct.Cl. 804 (1970); Home Indem. Co. v. United States, 376 F.2d 890, 180 Ct.Cl. 173, (1967).

sponsibly exercise the discretion given him.

In *Argonaut* the court found that there was no abuse of discretion on the part of the Government's contracting officer. In so holding, the court noted several facts that seemed to indicate the contracting officer had exercised reasonable discretion in not terminating the performing contractor merely because the surety had notified it of some outstanding debts the contractor had not paid. Initially, the contracting officer noted, at the time termination was requested, the progress charts indicated that the contractor was progressing satisfactorily. In addition, the payment that was made over the surety's objection was paid to an assignee of the contractor where it was put in trust to pay the obligations being generated under that contract. The money actually went to pay the laborers and materialmen. Finally, the court found that it would have cost more and taken longer for the Government to terminate the existing contractor and then substitute a new one. It was therefore clearly within the interests of the Government not to terminate the contractor, and since the money paid over the surety's objection did go to pay the subcontractors, the surety was not appreciably injured when the payment was made.

The facts in this case do not present as clear a basis on which to test a possible abuse of discretion. In fact, although the parties are both moving for some type of summary judgment, there seems to be a paucity of facts sufficient to measure the discretion exercised by the Navy's contracting officer. For example, the plaintiff contends the Navy knew on December 3, 1965, when the surety voiced its objection to the payment, that the contractor had not paid over $100,000 in labor and material bills. The Navy denies they were told anything other than that this contractor had not paid "some" bills, which standing alone is not uncommon and no reason to terminate the whole contract which at that point was 85–95% completed. The truth of the matter on this point bears heavily on just what evidence the contracting officer had before him when he decided to make the progress payment now at issue. There is also considerable confusion as to the actual progress the contractor was making as of December 3. In the telegram sent by the Navy representative on that date to the surety, it was stated: "The work at the site is progressing and it is expected that the work will be completed shortly." Nevertheless, by January 10, 1966, the Navy was sending a letter to the contractor stating that "[y]our daily progress is unsatisfactory" while referring to the expiration of a contract deadline which the contractor missed as far back as October of 1965. Clearly, the Navy was having difficulties with the contractor before the notification by the surety on December 3, which was not the case under the *Argonaut* facts.

However, even if the court would allow evidence to be received which clearly proved that the contracting officer abused his discretion in making the progress payment after being given notice by the surety of the contractor's default in paying the subcontractors, we would be powerless under the authorities cited, *supra,* to require that the Government make a payment of $29,000 to the surety when it is clear that the surety has not paid these subcontractors in full. Accordingly, plaintiffs' motion for summary judgment for the December 8, 1965 progress payment is denied and defendant's cross-motion is granted. In consideration, however, of the general equitable obligation that the Government owes, under proper circumstances, to the subcontractors who are the laborers and materialmen, the court is willing to entertain a motion for rehearing and new trial (Rule 151) and relief from this judgment as to the progress payment (Rule 152) if within 60 days from entry of this judgment the surety shows to the court that it has paid the subcontractors in full. In that event, we will reopen the case and remand it to the Trial Division for the

taking of proof on the issue of proper exercise of discretion by the contracting officer.

## CONCLUSION

To recapitulate, defendant's motion to dismiss all plaintiffs but the surety, United States Fidelity & Guaranty Co., is granted.

Defendant's motion for summary judgment is granted as to the $4,445.22 in net unexpended contract funds still held by it. Plaintiffs' cross-motion for partial summary judgment is denied as to this issue.

Defendant's motion for summary judgment is granted as to its right to have collected a tax obligation of the prime contractor, Premier Contractors, Inc., in the sum of $7,946.78 out of unexpended contract funds.

As to the plaintiffs' motion for summary judgment on the claim to the December 8, 1965 progress payment of $29,000 made by defendant to the prime contractor, Premier, after notice from the surety, the said motion is denied and defendant's cross-motion is granted. Plaintiffs are given 60 days from entry of judgment within which time to move the court pursuant to Rules 151 and 152 for rehearing, new trial, and relief from judgment, if it can be shown to the satisfaction of the court that the surety has paid all subcontractors in full.

Defendant's contingent cross-claim against the third-party prime contractor, Premier, is denied without prejudice. If the case is reopened under the circumstances outlined in the paragraph above defendant may renew its cross-claim if it desires to do so.

NICHOLS, Judge (concurring):

With respect to the disposition of the unexpended $4,445 balance and the defendant's right to collect a tax obligation out of retained funds, ahead of other creditors, I agree with the court and join in its opinion. As to the $29,000

payment, I think no trial should be necessary if the surety pays all claims of labor and materialmen. This court in Argonaut Ins. Co. v. United States, 434 F. 2d 1362, 193 Ct.Cl. 483 (1970) held that if asked to make a progress payment to a shaky contractor over a surety's protest, the Government's duty was to exercise discretion responsibly. The undisputed facts are that in paying out the $29,000, defendant denied it had any discretion. Its position was, so long as the work progressed, whether labor and materialmen were paid was not its concern. By implication, whether unpaid labor and materialmen were likely to continue working, was not its concern either. It is undisputed that not a cent of the $29,000 went to labor and materialmen, as defendant must have anticipated it would not. It seems futile to me to inquire whether defendant exercised its discretion responsibly when it did not purport to be exercising discretion at all. If I saw any lawful way to get the $29,000 directly into the hands of unpaid labor and materialmen, I would get it there now. The court is not offering the surety much of a deal: if it pays a much larger sum than $29,000 it gets a trial which may or may not obtain it $29,000 and no more. The court postulates that this surety, its officers and attorneys, are exceedingly fond of litigation or else attach large value to the establishment of a principle. If we held, as I think we should, that the $29,000 payment was on its face improper, we might entertain more optimism as to the money's going the right place, for principle would not have such heavy odds running against it.

DAVIS, Judge (dissenting in part):

The only aspect of this case in which I disagree with the court is as to the disposition of the $4,445.22 in net unexpended contract funds still held by the Government. Although of the view (which I join) that the subcontractors are entitled to that money,[1] the majority

---

1. The surety has clearly indicated that it is unwilling to pay the remainder of the subcontractors' claims (some $40,000) in order to obtain the $4,445.22, and there

sees no proper way in which this court can effectuate that conclusion. Agreeing that the subcontractors cannot on their own sue the United States directly, I would use the mechanism of our third-party practice, in the circumstances of this case, to give judgments to the various subcontractors in proper proportions. Our Rule 41(a)(1) provides:

> The court, on its own motion or on the motion of a party, may notify any person with legal capacity to sue and be sued and who appears to have an interest in the subject matter of any pending suit to appear as a party and assert his interest therein.

To the extent of the residue of $4,445.22, the subcontractors plainly "have an interest in the subject matter" of this suit, since they claim, and are found, to have the right to that money, and they wish it paid to them. As I understand the rule, the defendant could have moved that this notice be given them. Defendant has not done that—indeed, it has fought all along to keep the subcontractors entirely out of the case—but the court can do so on its own motion.[2] The purpose of the third-party practice is to clear up in one litigation, so far as possible, monetary claims against the Government. Multiple or repetitious litigation is to be avoided where feasible.[3] We can implement that purpose by treating the subcontractor plaintiffs, who are already here through their petition, as having been noticed in by the court under the rule, and as each having demanded his share of the $4,445.22. I would follow that route instead of dismissing them entirely from this case—a path which leaves them wholly depend-

ent upon the future good-will of the defendant (either in paying out the money itself, or in bringing an interpleader suit, as the court recommends).

---

is no showing, and no reason to believe, that anyone else has a better claim to the residue than the subcontractors.

2. I do not read the rule as limited to persons who could, on their own, sue the United States directly in this court, so long as the noticed person appears to

have an interest in the subject matter of the suit and is noticed in by the court on its own motion or at the behest of a proper party.

3. *Cf.* Bowser, Inc. v. United States, 420 F.2d 1057, 1063, 190 Ct.Cl. 441, 451 (1970) (Davis, J., concurring).