**ERICKSON AIR CRANE COMPANY OF WASHINGTON, INC.,\* Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 83–891.**

United States Court of Appeals, Federal Circuit.

March 26, 1984.

---

\* Some papers in this case erroneously name certain other corporations as parties. This is discussed in the opinion.

Hugh J. McClearn and Wilford A. Beesley, Salt Lake City, Utah, argued for appellants. With them on brief was Joseph J. Bronesky, Denver, Colo.

Mary Mitchelson, Washington, D.C., argued for appellee. With her on brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, and Sandra P. Spooner, Washington, D.C., Betty London-Jimmerson, Golden, Colo., of counsel.

Before MARKEY, Chief Judge, FRIEDMAN, Circuit Judge, and NICHOLS, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge.

This is an appeal from a United States Department of Energy Board of Contract Appeals (EBCA or board) decision, 83–1 BCA ¶ 16,145 (1982), denying recovery to appellant of amounts allegedly due it under certain clauses and due to breaches of other clauses of United States Contract No. 6/07/DC/71720. We *affirm*.

### I

*Background*

On January 12, 1976, the United States Department of the Interior's Bureau of Reclamation (government) entered into Contract No. 6/07/DC/71720 with Erickson Air Crane Company of Washington, Inc. (Erickson) to construct approximately 136 miles of 345 kilovolt transmission line from a point near Steamboat Springs, Colorado to Ault, Colorado. The contract required Erickson to have the transmission line in service by November 30, 1977, or suffer liquidated damages of $5,250 per additional day.

Since much of the transmission line's route lay over mountainous and heavily timbered terrain, Erickson intended to assemble and erect the steel transmission towers with a Sikorsky S–64 Sky Crane helicopter. Erickson subcontracted for the other "more routine" parts of the project with Pacific States Clearing (PSC) to build access roads and to clear the structure sites and the right-of-way; with a joint venture of Professional Hole Drilling, Inc. and Caissons, Inc. (PHD/C) to construct foundations for the transmission towers; with Tri-O, Inc. to string the conductor and overhead ground wire on the towers; and with New Growth, Inc. to landscape and revegetate the tower sites and temporary roads.

Erickson developed a comprehensive schedule for it and its subcontractors to follow: in rapid succession, PSC would clear a site, PHD/C would lay a foundation, Erickson would erect a transmission tower, Tri-O would begin wire stringing, and New Growth would begin revegetation. Due to Erickson's tight scheduling, however, single problems during construction often multiplied into several problems affecting other subcontractors down the line. Subcontractors' schedules became unsynchronized; costs rose for most of those involved in the project.

Erickson subsequently filed several dozen claims on its and its subcontractors' (claimants) behalf with the government's contracting officer, then in the Department of Energy (DOE). (DOE assumed responsibility for the project pursuant to the Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (1977). DOE assigned the project's administration to the Western Area Power Administration.) The contracting officer made his final decision on July 18, 1979, holding for the government on some claims, and against it on others.

Erickson, on behalf of all the claimants, appealed thirty-five of these adverse decisions to the EBCA pursuant to section 7 of the Contract Disputes Act of 1978, 41 U.S.C. § 606 (1982). The EBCA consolidated claimants' appeals for the purpose of a hearing. Counsel represented each of the claimants, with Erickson's counsel designated as "lead" counsel and called upon mostly for procedural matters.

Claimants' claims fell into three general categories. The first category consisted of claims alleging that during construction, the government delayed the work and disrupted the work sequence, and thus breached its contractual obligations or constructively changed the terms of the contract. Claimants argued that these government actions caused them to incur additional time, labor, and equipment costs for which the government is liable. The government responded that it merely enforced the terms of the contract and that any damages claimants suffered were due to their own failure to observe, acknowledge, or reasonably interpret various contract provisions.

The second general category consisted of claims alleging that the government's bid documents misrepresented the physical conditions under which claimants would work, and that this misrepresentation affected the required method and manner of performance. The government responded that the specifications clearly spelled out the required performance and the working conditions associated therewith.

The third category contained one claim for costs under the value engineering (VE) provisions of the contract. Erickson based this claim on the government's acceptance of a proposal Erickson presented to it on behalf of PHD/C to allow the modification of a specified type of tower footing under certain conditions. The government denied that Erickson's proposal for use of the particular footing was a VE proposal. The government also asserted that Erickson's proposal did not meet the technical requirements of a VE change proposal but was merely a contract change proposed and approved under the contract's "Changes" clause.

The EBCA issued its decision on September 30, 1982. Erickson, PHD/C, and Tri-O each filed a notice of appeal of the board's

decision adverse to them. Over the objection of the United States, we allowed PHD/C's and Tri-O's motions to attack through their own briefs the EBCA decisions adverse to them.

## II

### Standing of Subcontractors

It is a hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act, 28 U.S.C. § 1491, in the event of an alleged government breach or to enforce a claim for equitable adjustment under the Contract Disputes Act of 1978. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir.1983); *Putnam Mills Corp. v. United States*, 479 F.2d 1334, 202 Ct.Cl. 1 (1973). The government consents to be sued only by those with whom it has privity of contract, which it does not have with subcontractors. *Johnson Controls, Inc.*, 713 F.2d at 1550–52. Aggrieved subcontractors have the option of enforcing their subcontract rights against the prime contractor in appropriate proceedings, or of prosecuting a claim against the government through and in right of the prime contractor's contract, and with the prime contractor's consent and cooperation.

As a practical matter, prime contractors often do allow subcontractors to prosecute claims in the prime's name when they perceive that the subcontractors really have more at stake in a claim and are therefore willing to work harder on its enforcement. Subcontractors may also be the only ones in full possession of the facts. In the former Court of Claims, in contract cases, it was quite usual for prime contractors to step aside and allow counsel retained by subcontractors to prosecute claims, though always in the name and right of the prime. It is to be noted, too, that bonding requirements are often for protection of subcontractors and give them better assurance of being paid, in compensation for their inability to enforce liens against work which has become property of the government. *Johnson Controls, Inc.*, 713 F.2d at 1553–

54; *United States Fidelity & Guaranty Co. v. United States*, 475 F.2d 1377, 1381, 201 Ct.Cl. 1 (1973). In this case the board stated that Erickson took all the appeals before it, but elsewhere used language implying that subcontractors were appellants. Counsel entered appearances for them and the board made awards to them.

We directed the clerk in this case to accept briefs on behalf of subcontractors in their own names. This was done because of the role played by them below, because of recollection of the Court of Claims practice, and because the prime contractor sponsored their claims.

By hindsight, this was probably a mistake. It allowed avoidance of the rule of this court respecting length of briefs, Rule 13(b). In view of the number of appeal issues, it is possible, perhaps probable, the court would have allowed additional pages, but the procedure adopted denied the court any opportunity to keep down the briefing to the length most helpful to it. The object of briefs is, after all, to aid the court, not to enhance the earnings of counsel.

A more serious unfortunate consequence of our decision was that the brief writers, giving lip service to the rule that the subcontractors had no privity of contract with the government, in practice seemed to assume that the contrary was the law. They argued, ostensibly against the government, grievances that if valid were valid only against the prime. They tended to disregard negotiations between the prime and the government, or else agreements or transactions, in which they did not participate, that would have a strong bearing on whether the government was liable to pay an equitable adjustment to the prime. For this reason, the briefs were confusing and difficult for the court to follow. It appeared from statements by counsel that some suit or suits by the subcontractors against the prime are pending in other courts, but are stayed pending the outcome of this case. It seems almost as if there may be a feeling that the subcontractors must exhaust their remedies against the

government before their claims against the prime can be adjudicated.

It is but fair to say that despite the confusion incident to allowing subcontractors to participate as if parties, the appeal board in its able decision before us always kept clearly in mind who was the party against whom the claims were made, and who was the party properly prosecuting those claims. This is probably easier for a body specializing in contract cases than it is for a court with a more generalist jurisdiction.

■■ Notice is hereby given that in future contract cases in this court, only the prime contractor may be the appellant, absent, of course, special contract or regulatory provisions not here involved which, in some other cases, might confer standing on subcontractors or persons who normally would be deemed only subcontractors. The procedure followed in this case will not be regarded as a precedent in future cases. A party in interest whose relationship to the case is that of the ordinary subcontractor may prosecute its claims only through, and with the consent and cooperation of, the prime, and in the prime's name. Prime contractors may turn over part of their briefing space, and part of their argument time, to representatives of subcontractors, but this, when it occurs, is a private arrangement among interested parties which may not add to the jurisdiction of the court, or the burdens upon it. Specifically, for purposes of briefing space and argument time, a prime contractor and its subcontractors are, whatever their private understandings, one party for purposes of Rule 13(b).

### III

#### A. *Standard of Review*

■■ This court has a very limited review of boards of contract appeals, 41 U.S.C. § 609(b) (1982). The decision of the board on any question of fact is final and conclusive; we may not set that decision aside unless an appellant can meet its burden of establishing, on the basis of the record, that the decision is "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b). Thus, even though the record may contain evidence which supports a contrary position, we will not alter a board's finding if substantial evidence supports it.

In this case, we are faced with the anomalous situation of two members of a three-judge panel of administrative law judges (ALJs) merely concurring in, rather than joining with, a third member's lengthy opinion, but with no findings or legal conclusions of their own. The two concurring ALJs state, however, that they were satisfied that the necessary evidentiary and ultimate facts were present to support their conclusions. Since claimants have not shown us reversible error with respect to any stated fact, we rely fully on the facts set forth in the EBCA's one opinion.

■ In contrast to the finality we grant to the EBCA's findings of fact, we may engage in open review of its conclusions of law. We note, however, that legal interpretations by tribunals having expertise are helpful to us, even if not compelling. *See, e.g., Hegeman-Harris & Co. v. United States*, 440 F.2d 1009, 1011, 194 Ct.Cl. 574 (1971). As there stated, time and effort thus expended by such tribunals is not wasted even if an ultimate appeal to this court is anticipated. As regards the board's legal conclusions here, the nonjoinder places us in somewhat of a quandary, but we assume if the legal reasoning of the writing ALJ were deemed seriously flawed by the others, they would have shown us how.

#### B. *Value Engineering Claim—EBCA No. 65-7-79*

##### 1. *Facts*

The government included in the specifications for its power transmission line five types of transmission tower foundation footings, denominated Type A, K, D, F, and R footings. The Type A footing was to be

installed in good bearing material where a power auger and reamer could be used and the material could stand in the sides of the holes and undercut. Type D footings were to be used in fair bearing material within 15 feet of ground surface. Type R footings were to be installed in exposed rock, rock with overburden, or material whose number of blows per foot was greater than 20. Thus, an R-type footing would not be installed in clay or clay shale, but only in rock or gravelly material in which a power auger could not be used. The contract required the contractor to attempt initially to install a Type A or K auger footing, and if unsuccessful, to install a Type D, F, or R pad-type footing, depending on soil conditions.

At a preconstruction conference after the contract was signed, Mr. Terry, the contracting officer's representative, suggested to PHD/C that it request permission to use a modified A-type (Type AM) footing in very hard soils. Mr. Terry said to PHD/C that if it submitted such a proposal it would probably be accepted; Mr. Terry had suggested the Type AM footing's use to the government's design personnel prior to, but not in time for inclusion in, the solicitation of bids. Erickson, on behalf of PHD/C, formally requested the footing change on February 23, 1976. The document did not identify itself as a VE proposal nor make any reference to the VE clause. The government formally accepted the request on April 9, 1976.

On October 18, 1976, PHD/C, again through Erickson, requested an equitable adjustment in accordance with the Cost Reduction Incentive (Value Engineering) clause of the contract. Mr. Terry advised Erickson that because its footing modification had been proposed and accepted as of April 9, and the method of payment had been agreed to at that time, Erickson's request to consider the proposal under the contract's VE clause was untimely.

On May 8, 1978, Erickson submitted to the government a detailed claim of alleged cost savings. Erickson claimed $1,440,-367.73, which it alleged represented monies owed to it pursuant to the VE clause of the contract. The contracting officer in his final decision denied this claim as did the board.

2. *Discussion*

A contractor submitting what qualifies as a VE proposal often becomes entitled to an equitable price adjustment in the contract. Here, the specifications for the construction project defined the VE proposal, providing in pertinent part:

1.3.15. COST REDUCTION INCENTIVE (Value Engineering)

This paragraph applies to proposals initiated, developed, and submitted in writing after award of contract by the contractor for modifying the plans, specifications, or other requirements of this contract for the purpose of reducing the cost of construction. Only those proposals will be considered which would not impair essential functions or operating characteristics of the facility being constructed under this contract. Acceptance will be made by issuance of an order for changes or by other written notice. Proposals based solely on reducing contract delivery or completion periods, changing basic engineering designs, or eliminating requirements necessitated by public law will not be considered.

Cost reduction proposals shall contain a description of the difference between the existing contract requirement and the proposed modification, an itemized and detailed estimate of the anticipated reduction in the contractor's cost, the time within which a decision thereon must be made by the Government and other appropriate information.

This specification clearly sets forth several requirements which a proposal must meet in order to qualify as a VE proposal: the contractor must *initiate* the proposal, *develop* the proposal, and *submit* the proposal *in writing*. The proposal also is *required* to "*contain a description* of the difference between the existing contract requirement and the proposed modification, *an itemized and detailed estimate* of the

anticipated reduction in the contractor's costs, *the time within which a decision must be made* by the Government and other appropriate information."

This required information, if properly presented, gives the government notice that it is evaluating a VE proposal. The government requires such notice so that it can make an intelligent and informed decision as to the nature and impact of a contractor's proposal before ruling upon it. If unaware that a contractor is submitting a VE proposal, the government is unable fully to consider and balance the effect of any decision it may reach.

Erickson formally requested the footing change as follows:

> We request that you allow us to extend the drilled shaft an additional four feet into the very hard soil and eliminate the bell. This is proposed for those areas in which the bells could not be constructed using normal construction equipment and procedures. Any added costs for reinforcing steel and concrete would be absorbed by us.

This proposal, the EBCA found, contained no information which would put the government on notice that such proposal was a VE proposal. The EBCA further found that at no other time prior to approval did Erickson inform the government that it was submitting its proposal under the VE provisions of the contract, and that at no time prior to approval did the government recognize or treat the proposal as a VE proposal. In fact, Erickson never even referred to the VE clause of the contract until 8 months after Erickson submitted its request for change and 6 months after the government accepted that request.

 We are bound by the EBCA's findings as to the quantum of information imparted to the government by Erickson's change proposal. We hold as a matter of law that Erickson did not give the government its contractually required notice that a change was being suggested under the VE clause of the contract. If it had done so, Mr. Terry's role in eliciting the proposal would have to be considered and probably would be fatal to the VE claim. Erickson is therefore not entitled to an equitable adjustment pursuant to the VE clause.

### C. *Tri-O's Platform Claim—EBCA No. 75-7-79*

#### 1. *Facts*

When the government issued its specifications for the transmission line, it stated that it would permit the use of either a land crane or helicopter to erect the transmission towers. Erickson won the general contract based on a bid in which it assumed that it would use a land crane to erect all the transmission towers.

Erickson entered into its contract with the government on January 12, 1976; the contract then showed that Erickson intended to use helicopters to erect many towers. Erickson preferred to use helicopters because if it did, it would not have to build at each tower site earth platforms on which it could mount land cranes. Erickson's general manager testified, in fact, that when Erickson entered into its contract, he told Pacific States Clearing that it would not have to clear earth platforms at the sites where Erickson used helicopters.

Erickson and Tri-O reached an oral agreement on *their* contract terms and costs on January 12, 1976, and reduced their contract to writing on February 8, 1977. The contract did not specify Tri-O's required manner of performance for the stringing operation. Tri-O's president testified, however, that when Tri-O bid on its contract with Erickson, he believed that Erickson intended to use land cranes to erect the transmission towers and, as a result, Tri-O would find one leveled earth platform available at each tower site for its use. The EBCA could not determine from the record, however, the extent of any accord Erickson and Tri-O reached concerning the use of crane landings. There was no evidence at all, moreover, that the government and Erickson reached any agreement as to crane landings for the stringing operation. The government position was known and consistent in objecting

to any interference with the virgin environment not necessary for the work to be done.

Erickson did end up using a land crane for the erection of many towers. The government generally allowed Erickson to build earth platforms whenever Erickson considered them necessary. The government also permitted Tri-O to use these crane landings for its stringing operations. Tri-O was not permitted to build earth platforms at the tower sites where Erickson had used helicopters, however, on the grounds that the specifications did not permit earth platforms to be built for stringing work. Where no platform was allowed, Tri-O had to use more expensive stringing methods.

Tri-O contends that the government should reimburse it for its extra costs because the contract specified that there would be one leveled earth platform available at each tower site. Tri-O asserts that it relied on the availability of these platforms when it submitted its bid to Erickson.

The government argues, on the other hand, that the specifications provide for leveled earth platforms only for the erection of towers and not for use during the stringing phase of performance. The government claims that the change to the contract which permitted helicopter erection of certain towers eliminated the need for these platforms at many sites, and Tri-O had no right to insist these platforms be built for a purpose which, though primary to Tri-O, was secondary to Erickson and the government.

### 2. *Discussion*

The EBCA held that the contract, read as a whole, supports the government's interpretation that the contract allows platforms only for the process of erecting towers and not for stringing operations. In particular, the board found that the project specification contained only one paragraph describing the circumstances under which the government would allow the building of leveled earth platforms, paragraph 1.5.19, which stated that "[o]nly one leveled earth platform for the contractor's equipment in *erecting towers* will be permitted at each tower site * * *. Platforms shall be removed when no longer required * * *." [Emphasis supplied.] The board held:

The grammatical structure of the paragraph [1.5.19] reasonably indicates that platforms are to be removed when no longer required for the equipment used for erecting the towers.

■ Tri-O has failed to show us any reversible error in the board's conclusions or findings. That the government allowed Tri-O to use the platforms Erickson had constructed for erection of towers by land crane is irrelevant; such use is only evidence that the government was willing to permit Tri-O to use Erickson's existing platforms so long as the use did not conflict with revegetation requirements. We agree with the board's conclusion that the project contract did not guarantee that a leveled earth platform would be available for any activity other than the erection of steel structures.

Finally, we note that this particular contention is an excellent example of a subcontractor arguing as though it itself had substantive rights against the United States. Assuming that Tri-O was correct that the contract did require earth platforms, Erickson would have had to build such platforms, not the government. The government did not require Erickson to use helicopters to erect the towers; this was Erickson's own choice, and if in making that choice Erickson failed to protect its subcontractor, this does not make the government liable. Thus, any evidence that Tri-O has that Erickson's decision to use helicopter construction improperly deprived Tri-O of earth platforms which the contract terms led it to expect to find, if relevant at all, can only help Tri-O in an action against Erickson. Such evidence can in no way help Tri-O in an action against the government.

### D. *Other Issues*

We affirm the EBCA on claimants' remaining claims on the basis of the EBCA's

statement of reasons, which we find sufficient. No further discussion on the merits of these claims is necessary here.

Our decision as to these claims, however, is only with respect to the subcontractors' actions *against* the government. Several of the claims raise questions of improper acts done by the government in conjunction with Erickson; the subcontractors, therefore, may yet have valid actions against Erickson. We do not intend our decision here to imply that we have made any judgment as to the merit of similar actions between Erickson and its subcontractors.

## IV

### Conclusion

The decision of the Department of Energy Board of Contract Appeals is affirmed.

AFFIRMED.