UNITED STATES of America, for the Use and Benefit of CONSOLIDATED ELECTRICAL DISTRIBUTING, INC., Plaintiff,

and

Consolidated Electrical Distributing, Inc., Plaintiff–Counter–Defendant–Appellee,

v.

J.D. GRAINGER COMPANY, INC., et al., Defendant–Cross–Defendant,

and

AMWEST SURETY CO., Defendant–Third–Party–Plaintiff–Appellee,

v.

INTERNAL REVENUE SERVICE, Third–Party–Defendant–Appellant.

No. 90–35429.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1991.

Decided Sept. 18, 1991.

Kevin M. Brown and Gary R. Allen, U.S. Dept. of Justice, Washington, D.C., for defendant-appellant.

Nancy K. Bourgois, Russo & Graham, Seattle, Wash., for plaintiff-appellee.

Before WALLACE, Chief Judge, and O'SCANNLAIN and LEAVY, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We are asked to choose between the government and an unpaid subcontractor to establish who has priority to the collateral posted by the government's prime contractor who happens to be a delinquent taxpayer.

I

In 1986, prime contractor J.D. Grainger Company entered into a contract with the United States for the construction of a Magnetic Silencing Facility at the Bangor Naval Shipyard in Kitsap County, Washington. In accordance with the Miller Act, 40 U.S.C. §§ 270a–270d, Grainger contracted with the Amwest Surety Insurance Company for the issuance of payment and performance bonds on the project. Amwest issued a payment bond in the amount of

$675,000. Grainger also deposited certain collateral with Amwest, pursuant to several Collateral Security Receipt and Agreements, which was to be returned to Grainger once all of the surety's obligations under the bonds had been discharged.

Grainger employed a number of subcontractors on the project. On July 15, 1987, Amwest declared Grainger to be in default on its obligations, and began making payments on its payment bond. Grainger finished its construction on the facility on September 17, 1987, and was fully paid by the government.

One of the subcontractors Grainger used was Consolidated Electrical Distributing. From August 13 through October 20, 1987, Consolidated Electrical provided $67,966.66 worth of goods and supplies to Grainger, for which it has yet to receive any payment.

By the end of October 1987, the payment bond was exhausted. With Grainger's consent, Amwest continued to pay some subcontractors' claims from the balance of the collateral.

On September 28 and December 21, 1987, the Internal Revenue Service ("IRS") made assessments against Grainger for unpaid employment taxes totalling $40,796.69.

On January 6, 1988, Consolidated Electrical sent Grainger a letter notifying it that Grainger was delinquent in paying Consolidated Electrical and that the subcontractor intended to pursue its rights to sue on the payment bond pursuant to 40 U.S.C. § 270b. Consolidated Electrical specified the dollar amount of its claim. A copy of the letter was sent to Amwest as well. The letter did not mention the collateral held by Amwest.

On March 28, 1988, and June 27, 1988, the IRS made additional employment tax assessments against Grainger, totalling $49,020.74. At various times in 1988, the IRS filed notices of the tax liens which had arisen.

On July 13, 1988, Consolidated Electrical filed suit on the payment bond pursuant to section 270b against Grainger and Amwest, claiming $67,966.66 was owed. Subse-quently, on July 28, the IRS served a notice of tax levy on Amwest for the collateral. Amwest filed a third party interpleader action, settled all outstanding claims except those by Consolidated Electrical and the IRS, and deposited the entire remaining collateral ($58,426.65) into the registry of the court. Amwest has been dismissed. Consolidated Electrical has obtained default judgments against the Grainger firm, as well as individuals J.D. and Paula Grainger. Only the Consolidated Electrical and IRS claims remain in dispute.

The IRS moved for summary judgment. On December 20, 1989, the district court denied the motion. Its order concluded that Grainger, the taxpayer, had retained a possessory interest in the collateral to which the IRS's lien could attach, but that Consolidated Electrical's January 1988 letter created a "choate claim" enjoying priority over the IRS's lien, which was not served until July 1988. On February 15, 1990, the district court entered judgment denying the government's motion and, on April 4, it entered an amended judgment in favor of Consolidated Electrical for $58,-426.65. The United States appeals.

## II

The district court held that taxpayer J.D. Grainger Company possessed an attachable interest in the collateral held by Amwest for the purposes of the IRS lien. *See* I.R.C. § 6321 (1988) (lien arises "upon all property and rights to property ... belonging to" the delinquent taxpayer). Consolidated Electrical contends that the IRS's lien was ineffective, because Grainger's interest was too remote. *See, e.g., City of New York v. United States,* 283 F.2d 829, 832 (2d Cir.1960) (section 6321 lien "is not a proper basis for a levy on contingent rights before they come into being").

Under the terms of the collateral security agreements, the deposit was intended to be a security for Amwest against all liabilities, losses, or costs incurred by Amwest in its role as surety. The surety was given sole discretion to use the collateral security as needed. However, there was also a

provision for the return of the collateral to Grainger or its successor:

11. RELEASE OF COLLATERAL SE-CURITY.

Upon receipt of written evidence satisfactory to Surety of its discharge from all liability under such bonds, and of ownership of the collateral security by the applicant (it being recognized that differences of opinion with regard to proof of ownership and of termination of liability, require the giving of considerable latitude to Surety in the determination of what evidence is reasonable), and of payments of all amounts due as provided herein, Surety shall, within a reasonable time, return said collateral security or the proceeds thereof, less any deductions pursuant to the terms of this agreement, to the party then designated as Owner.

■ A number of courts have held that a taxpayer-contractor has no property interest, at least for the purposes of section 6321 or its predecessors, in funds held by a surety or withheld by the contracting party for payment of subcontractors or other creditors of the taxpayer. *See, e.g., Central Surety & Ins. Corp. v. Martin Infante Co.*, 272 F.2d 231, 234–35 (3d Cir. 1959); *United States v. Pan American Bank of Miami*, 13 A.F.T.R.2d 996, 997 (S.D.Fla.1964) ("[t]axpayer had no interest or property right [in trust account funds] except a remote and contingent interest in the event that there was an excess of funds on deposit in said account after the payment of all bills and obligations.…"). These cases are distinguishable, however, because they involved deposits intended to benefit the subcontractors, whereas the Amwest–Grainger collateral agreements were intended to benefit the surety. The distinction is critical. Under the collateral security agreements, Grainger was entitled to a refund as soon as Amwest received satisfactory evidence that its obligations as surety were discharged, regardless of any remaining claims by subcontractors. The district court found that Amwest's liability

had been discharged and that Amwest had disavowed any interest in the collateral by filing a third-party interpleader action and depositing the collateral with the court. Grainger's future possession of the collateral was not speculative or conjectural. We conclude that the district court correctly found there to be an attachable interest in the collateral.

### III

The district court concluded that Consolidated Electrical's Miller Act letter was sufficient to create a "choate claim" over the collateral that took priority over all of the IRS's unserved liens, although more than $40,000 in tax assessments had accumulated before Consolidated Electrical transmitted its letter. Consolidated Electrical now proposes several different theories under which its Miller Act notice could give it priority over some or all of the IRS liens on the collateral. We consider each theory in turn.[1]

### A

■ Consolidated Electrical's first theory is that its Miller Act notification letter created a claim analogous to a "mechanic's lien." Under I.R.C. § 6323(a), a tax lien which is not supported by a filing will not have priority over a mechanic's lienor. Since the IRS's notice of its tax liens followed Consolidated Electrical's Miller Act notice, if a mechanic's lien were created, it had priority for the entire remaining collateral.

A mechanic's lienor is "any person who under local law has a lien on real property (or on the proceeds of a contract relating to real property) for services, labor, or materials furnished in connection with the construction or improvement of such property." I.R.C. § 6323(h)(2) (1988). The collateral funds at issue here are not real property nor the proceeds of a contract for real property. Consolidated Electrical has not established a mechanic's lien.

---

1. For the purposes of this exercise, we assume without deciding that it is possible under the Miller Act for a subcontractor to affix a lien to collateral funds.

Consolidated Electrical offers plausible policy arguments for reading flexibility into the Internal Revenue Code and disregarding state law requirements for establishing a mechanic's lien. Absent any evidence that alternative remedies were contemplated by the Miller Act, expansion of remedies available under the Act should be left to Congress. *Arvanis v. Noslo Eng'g Consultants, Inc.*, 739 F.2d 1287, 1293 (7th Cir.1984), *cert. denied*, 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969 (1985).

B

■ The district court apparently was persuaded by Consolidated Electrical's "choate lien" theory. The district court concluded that this theory entitled Consolidated Electrical to take priority over all of the IRS tax liens.[2]

In order to be "choate," a lien competing against a federal tax lien must be specific as to the identity of the lienor, the amount of the lien, and the identity of the property to which it attaches. *United States v. City of New Britain*, 347 U.S. 81, 86, 74 S.Ct. 367, 370–71, 98 L.Ed. 520 (1954); *see also Atlas, Inc. v. United States*, 459 F.Supp. 1000, 1003 (D.N.D.1978). In addition, a lien is choate when it is "definite, and not merely ascertainable in the future by taking further steps [regarding] (1) the identity of the lienor, (2) the amount of the lien, and (3) the property to which it attaches." *Illinois ex rel. Gordon v. Campbell*, 329 U.S. 362, 375, 67 S.Ct. 340, 347, 91 L.Ed. 348 (1946) (internal citations omitted); *see also United States v. Pioneer American Ins. Co.*, 374 U.S. 84, 89, 83 S.Ct. 1651, 1655–56, 10 L.Ed.2d 770 (1963) (liens become choate when the three prongs are established).

No one disputes that Consolidated Electrical's January 6, 1988 letter fulfills the first two requirements for choateness. The parties do not agree, however, about whether the Miller Act notice fulfills the third requirement. Consolidated Electrical contends that the letter's statements that it

"has a claim against the payment bond" and "intend[s] to pursue its rights under the Miller Act" fulfill the property identification requirement. Conversely, the IRS contends that absent any mention of the collateral fund, Consolidated Electrical's letter fails to establish the identity of the property.

The purpose of the Miller Act is to provide a remedy for subcontractors on federal projects where ordinary mechanic's liens on federal property are banned, and " 'to effectuate the Congressional intent to protect those whose labor and materials go into public projects.' " *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 124, 94 S.Ct. 2157, 2162–63, 40 L.Ed.2d 703 (1974) (quoting *Clifford F. MacEvoy Co. v. United States ex rel. Tomkins Co.*, 322 U.S. 102, 107, 64 S.Ct. 890, 893–94, 88 L.Ed. 1163 (1944)). Although we are to construe the act liberally in order to effectuate the act's purposes, *see id.*, the *New Britain* choateness requirements remain in force. The question is close. Nonetheless, we must agree with the IRS that the third choateness requirement was not satisfied. Consolidated Electrical's letter appears to be an attempt to receive any remaining funds in the Amwest payment bond. Since it is not even clear that a subcontractor may attach collateral under the Miller Act, *see supra* note 1, there is little logical reason to assume that Consolidated Electrical's letter was an attempt to do just that without even mentioning the collateral. Whatever "partial" or "substantial" compliance with the choateness requirements that arguably is urged by *F.D. Rich* was not met here.

C

■ Finally, Consolidated Electrical argues that, if nothing else, it has an "equitable lien" on the collateral because it has received nothing on the project and the government (albeit not the IRS) enjoys the benefits of the completed contract. As is

---

**2.** That aspect of the district court's conclusion is dubious. Before Consolidated Electrical filed its Miller Act notice, the IRS had made tax assessments in 1987 totalling $40,796.69. Be-

cause tax liens pursuant to section 6321 arise on the date of assessment, *see* I.R.C. § 6322 (1988), the IRS appears to have been first in time at least as to the bulk of the contested collateral.

often true when "equitable" principles enter the mix, it is difficult to gauge the contours of such a concept.

In comparing the facts of this case to the precedents, we feel that on balance Consolidated Electrical has not established an equitable lien over the government. In *United States Fidelity & Guaranty Co. v. United States*, 475 F.2d 1377, 201 Ct.Cl. 1 (1973), the court held that when a prime contractor owes the United States some obligation, including a tax, the debt is not defeated by a surety's payment bond claims or subcontractors' claims. *See id.* 475 F.2d at 1383–84. "Though the subcontractors may have an equitable right to the retained funds," said the court, "their claim to it, like the surety's, is subservient to the tax lien of the United States." *Id.* at 1384. Similarly, in *Barrett v. United States*, 367 F.2d 834, 177 Ct.Cl. 380 (1966), the court, while holding that a claim against a Miller Act bond was inferior to the government's right to set off the amount of taxes owed by the prime contractor against contract retainages in the hands of the government, noted the "vital distinction between instances in which the United States is claimant to the funds in its possession and those situations in which the United States is an impartial stakeholder of funds confessedly owing to one of the contesting parties." *Id.* 367 F.2d at 837.[3]

*Kennedy Electric Co. v. United States Postal Service*, 508 F.2d 954 (10th Cir. 1974), is distinguishable. In that case, the court recognized an equitable lien held by an unpaid subcontractor in funds retained by the contracting governmental agency where the prime contractor had failed to obtain a performance bond at all, thereby eliminating the premise for the Miller Act limitation on liens against federal property. *See id.* at 958. The Postal Service (and its predecessor, the Post Office Department) simply ignored the rules requiring supervision of the project and restricting progress payments. *Id.* at 956. Under those facts, it was inequitable for the Service to keep $45,000 in liquidated damages; the project

was completed, and the subcontractor had not been paid. *Id.* at 957. In contrast, here the IRS, as the competitor for the money, has committed no wrong and has enjoyed no benefit from the arrangement. Nothing justifies its placement at the back of the line.

## IV

While we are sympathetic to Consolidated Electrical's plight, we cannot reshape the Miller Act in the manner urged by the subcontractor. The IRS could properly place and enforce a lien on the collateral. Consolidated Electrical did not meet the requirements for creating a lien on the collateral that could take priority over the IRS liens.

The district court's order entering judgment in favor of Consolidated Electrical is reversed, and the case is remanded with instructions to enter judgment for the government.

**REVERSED and REMANDED.**

---

3. The equities in Consolidated Electrical's favor are diminished when it is considered that the government could simply have set off the

amounts of the tax assessments against the money owed Grainger under the contract.