**CHELSEA FACTORS, INC.,**
v.
**UNITED STATES.**
No. 372–55.

United States Court of Claims.
March 2, 1960.

Whitaker, J., dissented in part.

Richard T. Conway, Washington, D. C., for plaintiff. Louis Zasloff, Minot & Zasloff, New York City, and Lawrence J. Latto, Washington, D. C., were on the briefs.

Gerson B. Kramer, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Acting Asst. Atty. Gen., George S. Leonard was on the brief.

MADDEN, Judge.

The plaintiff sues, claiming that it is the assignee of the proceeds of a contract between the Government and Suburban Frosted Foods, Inc. The Government asserts numerous defenses. The plaintiff is a corporation that engages only in the business of lending money on the security of specific merchandise. Its customers are wholesalers who need funds with which to purchase merchandise for resale, and who can pledge with the plaintiff as collateral their warehouse receipts or other evidence of title to the merchandise. When the borrower resells the merchandise, he has to obtain the release of the collateral by the plaintiff, by paying off the loan or substituting other equivalent collateral.

The plaintiff, at the time here involved, had an arrangement with the National City Bank of New York whereby the plaintiff could borrow from the bank up to 80 percent of the amounts loaned by the plaintiff to its customers, by placing with the bank as collateral the customers' notes and the documents of title pledged by the customers to the plaintiff. In that situation the bank, of course, had to release the documents of title before the plaintiff's customer could resell the merchandise. The bank would give such a release only upon the payment of the plaintiff's note to it, or the substitution of other collateral.

One of the plaintiff's customers was a corporation, Suburban Frosted Foods, Inc., which was engaged in wholesaling frosted foods to the Government and to private purchasers. Between November 28, 1951, and February 7, 1952, the plaintiff loaned Suburban $27,132.10 to be used by Suburban to purchase three separate lots of frozen foods and to pay the freight charges on one of the lots. Suburban gave the plaintiff four notes totaling the $27,132.10, and pledged as collateral the warehouse receipts for the frozen foods. The plaintiff pledged Suburban's notes and the warehouse receipts to National City Bank for four separate loans totaling $20,200, evidenced by four separate notes.

On February 26, 1952, Suburban entered into two contracts with the Department of the Army, Quartermaster Market Center, New York City, to supply the Army with 100,000 pounds of frozen corn and 70,000 pounds of frozen peas, at specified prices per pound, the total contract price being $36,631. The contracts contained express provisions consenting to the assignment by Suburban of the money, to which it might become entitled under the contract, to a bank or other financing institution, pursuant to

the Assignment of Claims Act of 1940, as amended, 31 U.S.C.A. § 203, 41 U.S.C.A. § 15.

Suburban intended to use the frozen foods, the warehouse receipts for which it had pledged with the plaintiff, to fulfill its contracts with the Government. It obtained the consent of the plaintiff and the bank to the release of the frozen foods from the warehouse, and their delivery to the Army, upon substituting, as collateral, an assignment of its rights to receive payments from the Army for its delivery of these frozen foods in performance of its contracts. Suburban prepared two assignments, on standard government forms, naming the bank as assignee. It also prepared a letter, addressed by it to the bank, a copy of which letter accompanied each of its two assignments to the bank. The letter instructed the bank as follows:

"All funds collected or to be collected by the National City Bank of New York through the assignment dated Feb. 28, 1952 between you and ourselves with reference to funds due on [the particular contract] are to be given to Chelsea Factors Inc. * * * after application of the indebtedness due National City Bank of New York.

"Chelsea Factors Inc. are to have full title to these remaining funds."

These assignments and letters were accepted by the bank and the plaintiff as substitute collateral for the frozen foods, the warehouse receipts for which were held by the bank, and the warehoused goods were thereupon released from the pledges, and were available for delivery to the Army.

The bank sent notices of the two assignments, on standard government forms, and copies of the assignments, to the contracting officer and the disbursing officer, as required by the statute.

On March 13, 1952, Suburban borrowed an additional $2,600 from the plaintiff to pay Suburban's shipping costs on the frozen foods shipped under Suburban's contracts with the Army, giving the plaintiff four notes secured by the money which Suburban was to receive under its contracts with the Army. The plaintiff, in turn, borrowed an additional $4,000 from the bank, giving its note for that amount secured by Suburban's assignment to it of the money to become due under the contracts.

Suburban, in March of 1952, made four shipments to the Army. One shipment of 30,000 pounds of frozen peas was rejected by the Army because of improper packaging. The Army secured these frozen peas from another supplier at a cost exceeding by $825 the amount it would have had to pay Suburban at Suburban's contract prices. Suburban made a second shipment stated in Suburban's invoice to contain 39,900 pounds of frozen peas and 35,000 pounds of frozen corn. Suburban's invoice called for $15,936.27 for this shipment, and that sum was paid by the Army to the bank pursuant to Suburban's assignments to the bank. In fact there were shortages in the shipment, and the invoiced price was excessive by $576.56 for the peas and $561.75 for the corn.

Suburban made two further shipments, stated in its invoices to contain 65,000 pounds of frozen corn. In fact only 59,-500 pounds of corn was shipped. It was received and used by the Army. At Suburban's contract prices it was worth $13,369.65. The Government has not paid any part of this sum to anyone. The Government discovered the shortages in the shipments, and withheld payment. The plaintiff inquired of Suburban and learned of the shortages, urged Suburban to make up the shortages, which Suburban promised to try to do. The Government's investigation disclosed that the shortages were due to fraud on the part of Suburban. Suburban and its principal officers were, in 1953, convicted of violations of section 1001 of Title 18, U.S.C. Theretofore, on May 29, 1952, Suburban had filed a petition in bankruptcy and had been adjudicated a bankrupt.

As appears above, the Army paid the bank $15,936.27 on one of Suburban's in-

voices. The bank used the money to pay off, so far as it went, the plaintiff's notes to the bank secured by the Suburban assignments. The balance due on those notes was paid by the plaintiff to the bank.

The above recital shows that the plaintiff financed Suburban's contracts with the Army; that the Army received from Suburban and used $13,369.65 worth of frozen foods for which it has not paid anyone; that against this $13,369.65 the Army had offsets against Suburban in the amount of $825 of excess costs of replacing a defectively packed shipment, and $576.56 and $561.75 of overpayments included in the payment of $15,936.27 shown above. Suburban, before its discharge in bankruptcy, was indebted to the plaintiff in an amount greater than the $13,369.65, the value of the frozen foods which the Government received and has not paid for, less the three offsets referred to above, amounting to $1,963.31.

If the plaintiff's loans to Suburban to finance its performance of Suburban's contracts with the Government were secured by Suburban's assignment of the proceeds of those contracts, the plaintiff is entitled to the money still in the hands of the Government. The Government says that the plaintiff's loans to Suburban were not so secured because there was no assignment by Suburban to the plaintiff, the only assignment being to the National City Bank.

The Assignment of Claims Act, supra, in its third proviso says:

"* * * any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing;"

The arrangement between the bank, the plaintiff, and Suburban in the instant case, made the bank a trustee for the plaintiff of Suburban's assignment to the bank. The bank had loaned no money to Suburban to finance its contracts with the Government. It loaned money to the plaintiff, which the plaintiff became absolutely bound to pay to the bank, regardless of the outcome of Suburban's transactions with the Government. The bank knew that the plaintiff borrowed the money from it in order, in turn, to lend it to Suburban to finance Suburban's Government contracts. It agreed with Suburban and with the plaintiff that, when it received money from the Government under the assignments, it would use the money, so far as necessary, to pay itself the amount which the plaintiff owed it on the loans which the plaintiff had obtained from it to reloan to Suburban, and would turn over the excess, if any, to the plaintiff. If it had failed to do so; if, for example, it had attempted to use such an excess to pay itself for other debts which the plaintiff might have owed it, it would have been guilty of a breach of trust to Suburban, which had a right that the money paid under its contracts should be used to pay *its* debts, and not those of someone else. If it were necessary, which of course it is not, that a "trustee" within the meaning of the third proviso of the Assignment of Claims Act must be so constituted by a written document spelling out his duties, the writing made by Suburban and assented to by the bank and the plaintiff did spell out for the bank the duties of a trustee, i. e., the duty to receive and use money for the benefit of another person.

The Government says that even if the assignment, plus the trust relation which the bank assumed as the assignee, gave putative rights to the plaintiff under the statute, the plaintiff never perfected those rights by giving to the Government the notices which the statute requires. The fourth proviso of the statute says:

"4. * * * in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with (a) the contracting officer or the head of his department or agency; (b) the surety or sureties upon the bond or bonds, if any, in connec-

tion with such contract; and (c) the disbursing officer, if any, designated in such contract to make payment."

As we have seen, the bank gave the notices required by the statute. The statutory purpose of the notice is, of course, to prevent the payment of the contract money to the contractor, or to some subsequent assignee, or to prevent its being retained by the Government to satisfy some obligation of the contractor to the Government unconnected with the contract, if the contract permits an assignment "not subject to reduction or set-off."

As we have seen, the statute permits an assignment to one (and only one) finance institution, but provides that that one may be a trustee "for two or more parties participating in such financing." The Government is urging that the notice given by the one assignee to the Government must advise the Government of the arrangements which the bank has with any number of persons who may have signed notes and put up collateral with the bank to induce it to participate in the financing, or to permit its name to be used as assignee to satisfy the statute. When the Government has received this information, which it says is a *sine qua non* to an effective assignment, what does it propose to do with it? Is it willing, at its peril, to undertake to pay out the proceeds of the contract to the persons named as beneficiaries of the trust, and in accordance with their various, and variable from time to time, equities? The statute does not, of course, load the Government with any such burden. But if, as the Government argues, the statute requires that notice be given of the equities, a court would be hard put to justify the Government in disregarding the equities and paying the money to the *one* assignee of which it had notice.

The 1940 Amendment to the Assignment of Claims Act was intended to facilitate the financing of Government contracts by private capital in the way in which private capital normally operates in financing the country's economy. It

was not an act for the encouragement and multiplication of suits at law and bills of interpleader in equity.

We hold that the notices given by the bank were valid, and preserved the rights of the plaintiff as the beneficiary of the bank's ownership, as a trustee, of the assignment.

■ We have referred above to the shortages in Suburban's shipments, and the conviction of Suburban and its officers of the offense of filing false claims against the Government. The consequence of this fraud was that any right of Suburban to be paid for the frozen foods which it delivered and which were accepted and used, was forfeited. 28 U.S.C. § 2514. The Government urges that the security of the assignee was thereby forfeited. We held to the contrary in Arlington Trust Company v. United States, 100 F.Supp. 817, 121 Ct. Cl. 32. The Government urges us to repudiate that precedent. We can think of no more effective way to destroy the purpose and usefulness of the Assignment of Claims Act of 1940 than to do that. We see no reason why a banker, or those for whom he acts in financing a Government contract, should forfeit their security because of fraudulent acts of another person in which they did not participate. We cannot see why any prudent person would lend a dollar to finance a Government contract, if such a risk were added to those normally inherent in the lending of money.

■ The Government says that the plaintiff was, itself, guilty of fraud in attempting to collect money on Suburban's contracts after it knew of the shortages in the shipments.

When the defendant withheld payment of Suburban's vouchers A 418 and A 430, Chelsea, having learned that the Suburban contracts were being investigated by defendant, called in Suburban's officers, and they confessed the shortages. Chelsea urged them to make up the shortages and they promised to try to do so. On May 5, 1952, about six weeks after the last invoice had been submitted,

Chelsea wrote the bank, the named assignee, the following letter:

"Re: Assignment of Government Contracts No. 23424, & No. 23426

"The above contracts were entered into by Suburban Frosted Foods Inc., 807 Washington Street, N.Y.C., the proceeds of which have been assigned to you, and discounted by you with our firm.

"To date only one invoice has been paid, leaving three invoices outstanding. The payment of these invoices have [sic] been overdue for some time now, and inquiries I have made to the disposition of these funds have given me no satisfaction.

"Since the government recognizes only you as the assignee of the above mentioned contracts, I hereby request of you to write the parties involved to determine the cause for delay in payment.

"The invoices involved are as follows:

"Contract No. 23424: Invoice No. A418 Dated March 12, 1952, $6,741.00; Invoice No. A429 Dated March 26, 1952, $6,069.00.

"Contract No. 23426: Invoice No. A430 Dated March 26, 1952, $7,864.50; Invoice No. A417 Dated March 12, 1952 was paid on March 26, 1952 in the amount of $15,936.27.

"Copies of the above invoices are in your files for future reference, [sic] I would appreciate your acting on this as soon as possible."

Defendant argues that as a result of this letter, the plaintiff's claim against the United States was forfeited pursuant to 28 U.S.C. § 2514.

The plaintiff's letter to the bank was, obviously, not straightforward and frank. It then knew that there had been shortages in Suburban's deliveries and that the Government was aware of the shortages and was investigating Suburban's conduct. If it had been completely frank, it would have so advised the bank. But its omission to do so could not possibly have been with the hope or intent of misleading the Government into paying for goods which it knew that the Government knew that it had not received.

There were many questions which had to be taken up with the Government by the bank. As we have seen, the Government, in Arlington Trust Co. v. United States, supra, took the position that the fraud of a contractor, in no way participated in by his assignee, was imputable to the assignee, and resulted in a forfeiture of the assignee's rights under his assignment. Was the Government taking that same position in this case, and therefore refusing to pay the assignee for the goods which it had actually received and used? All of the questions which have been so vigorously litigated in this case were to be answered, and the answers had to come, in the first instance, from the Government. It was not for the plaintiff to determine whether Suburban's shortages had been fraudulent or only inadvertent. It was entirely proper for the plaintiff to ask the bank to ask the Government what position it was taking with regard to the rights of the assignee. The bank made the inquiry, and the Government answered it. No one was misled, and, it seems plain to us, no one was ever intended to be misled.

To deny recovery to the plaintiff would be to impose a fine of some $12,000 upon it, not for fraud, but for lack of frankness. This seems to us to stretch the language and the purpose of section 2514 far beyond the breaking point, and to violate all the precedents to the effect that fraud, resulting in forfeiture, can be found only on the basis of clear and convincing evidence.

When the Government refused to pay for the frozen foods which it accepted and used, and the bank had collected all the money which it had put into the transaction, and Suburban and its officers had been convicted of fraud, and the Government was charging fraud against the plaintiff, the National City Bank refused to take any further steps

to enforce the rights created by the assignment. We think it took a very light-hearted attitude toward its duties as trustee under its agreement with the plaintiff. It even refused to allow the plaintiff to use its name as trustee in a suit to ascertain the plaintiff's rights under the assignment.

The plaintiff brought this suit in its own name. On September 26, 1957, while this suit was pending, the bank gave the plaintiff two documents, each entitled "Reassignment", which documents by their terms "reassigned" the bank's rights, under Suburban's two contracts, to the plaintiff.

The third proviso of the Assignment of Claims Act says that:

"Unless otherwise expressly permitted by such contract any such assignment * * * shall not be subject to further assignment."

Suburban's contracts with the Government expressly stated that the contracts "may thereafter be assigned and reassigned to any such institution." The context shows that "such institution" meant a bank, trust company or other financing institution. The Government concedes that the plaintiff is a financing institution within the meaning of the contracts.

■■ It would seem, then, that after these "reassignments" the legal rights and the equitable rights under the assignment had come to rest in the same person, and that even the formal procedural requirements had been placed beyond argument. But the Government says that the merger of rights occurred too late. It says that by 1957 when the "reassignments" took place, the plaintiff was fully aware of all of Suburban's wrongdoings, and of all of the Government's defenses and counterclaims. This is perfectly true, and we must determine whether it is material.

In the interpretation and application of the Assignment of Claims Act of 1940 it becomes necessary, in order to make the act workable and fair, to call upon analogies in the fields of equity and ne-gotiable instruments. When the bank in the instant case took the assignments as trustee, both it and its beneficiary, the plaintiff, were bona fide purchasers. They continued in that moral position during the time that their money was advanced to Suburban, and during Suburban's performance of the contracts. The bank, then, got its legal right as assignee, and the plaintiff got its equitable right as the beneficiary of the trust, the *res* being Suburban's assignment, as purchasers in good faith. The Government says that a transfer of the legal title by the trustee to the owner of the equitable title of a chose in action, makes the chose in action subject to the infirmities and defenses which the equitable owner, the transferee, had become aware of by the time the transfer took place.

That cannot be sound doctrine. It would mean that if a trustee of an estate, for example, in good faith purchased bonds, payable to bearer, and it was later discovered and published that the bonds had been stolen, the beneficiaries of the trust who knew that the bonds had been stolen could never receive the bonds or their proceeds without being liable to restore them to the one from whom they were stolen. It is conceivable that if the beneficiaries of the trust knew, although the trustee did not, at the time of the purchase, that the bonds had been stolen, the bonds would have to be restored to the true owner. But we cannot accept the reverse of that proposition, as the Government urges. In the instant case both the trustee bank and the beneficiary, the plaintiff, were good faith purchasers when they invested their money and took Suburban's assignments as security. The later merger of the two rights into one did not destroy or impair the equity which the assignment had created long before this merger.

The plaintiff's standing to sue in this court is founded upon the reassignments to it by the bank, which reassignments were expressly permitted by its contracts with the Government, and by the statute. What standing it might have had in the absence of the reassignments it is not

necessary for us to decide, and we do not decide.

■ The amounts which Suburban owed the plaintiff on the loans secured by the assignments here in question were reduced by the payment of the Government to the bank of the one invoice referred to above, and by a number of payments of interest by Suburban to Chelsea. The notes bore interest at the rate of 1¼% per month, and provided that legal fees incurred in attempting to collect on the notes should be added to the face of the notes. There was an item of $340 for such fees, and an item of $15.36 for warehouse storage. The rate of interest was shockingly high but it was, apparently, not illegal nor even unusual.

The Government urges that the plaintiff should recover only the principal of its loans; that for it to recover interest would be a violation of the doctrine that the Government is not obliged to pay interest in the absence of a statute or a contract providing for interest. The Government misapprehends the situation. It will not be paying interest. It will be paying for frozen corn and frozen peas which it received and used and has not paid for. The Government, by the Assignment of Claims Act of 1940 has consented that its obligations to contractors may be used as collateral by contractors in borrowing money to finance performance. Naturally, it has not said that such loans must be without interest. The collateral, as in all other situations, secures the payment of interest, attorney's fees, and other agreed-upon charges, as well as the principal of the loans.

■ Suburban's contracts with the Army contained the provision that:

"Notwithstanding any other provision of this contract, payments to an assignee of any monies due or to become due under this contract shall not, to the extent provided in said Act (The Assignment of Claims Act of 1940) as amended, be subject to reduction or setoff."

The Act authorized the insertion in Government contracts of "no set-off" provisions and said that when such a provision was inserted in the contract payments to the assignee should not be subject to reduction or setoff for any liability of the contractor-assignor to the Government arising independently of the contract, nor for any liability for renegotiation repayments or for

"(2) fines, (3) penalties (which term does not include amounts which may be collected or withheld from the assignor in accordance with or for failure to comply with the terms of the contract), or (4) taxes, social security contributions, or the withholding or nonwithholding of taxes or social security contributions, whether arising from or independently of such contract."

As we have seen, Suburban filed a petition in bankruptcy in 1952 and was adjudicated a bankrupt. The United States filed a priority claim for $22,775.07 which was allowed. The proof of the claim consisted of a sworn statement by the Assistant Comptroller General listing several small items of claim, and a claim of $20,111.84 alleged to be due the Government because of Suburban's substitution of ungraded and inferior merchandise in shipments under five of its contracts, none of which were the contracts whose assignment is involved in this case.

The plaintiff was not a party to the bankruptcy proceedings. It chose to rely, as it had a right to do, upon its notes secured by collateral. There apparently were no assets for the creditors in the bankrupt estate. In the circumstances, there would have been no objection to, and not much judicial consideration of, the Government's claim. The allowance of it is of course not binding on the plaintiff. In the instant suit the Government has not been able to reconstruct or support the claim, except to the extent of the three items of $825, $576.56, and $561.75, a total of $1,963.31, which we have recited above. It counterclaims for and seeks to set off double damages and forfeitures under the False Claims Act, 31 U.S.C.A. § 231 ff., in the amount of

$8,276.62. A discussion of this question would be a repetition of what we have said in this opinion and elsewhere about the right of the Government to invoke a forfeiture for fraud, under 28 U.S.C. § 2514, against an innocent assignee of a Government contract.

Our conclusion is that Suburban had earned $11,406.34 in the performance of its contracts, ($13,369.65 less $1,963.31) above what has been paid; that Suburban was indebted to the plaintiff on its notes to the plaintiff secured by the assignment of its contracts, in an amount greater than $11,406.34, and that the plaintiff is therefore entitled to a judgment for $11,406.34. The counterclaim is dismissed.

It is so ordered.

JONES, Chief Judge, LITTLETON, Judge (Ret.) and LARAMORE, Judge, concur.

WHITAKER, Judge (dissenting in part and concurring in part).

I cannot agree that Chelsea Factors acquired any rights against the defendant by virtue of Suburban's assignment to the bank and its letter to the bank instructing it to pay to Chelsea the excess received by it over the amount necessary to discharge Chelsea's note. As between the bank, Suburban and Chelsea, the bank did become a trustee for Chelsea, but not as to the defendant. This is so, because a copy of Suburban's letter to the bank was not given the defendant, nor was the defendant otherwise notified of Chelsea's interest in the assignment. While the amendment to the antiassignment statute permitted an assignment to a financial institution as a trustee for others participating in the financing of a Government contract, still, it provided that notice of the assignment be given the defendant. This necessarily implies, in view of the purpose of the antiassignment statute, that the defendant be put on notice of those having an interest in the funds assigned. Defendant did not want unknown claimants making demands on it. When it paid out money it wanted to be sure it was paying the right party and would not have to pay it again. This was the purpose of the original antiassignment statute, Hobbs v. McLean, 117 U.S. 567, 576, 6 S.Ct. 870, 29 L.Ed. 940; United States v. Aetna Cas. & Surety Co., 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171; Pittman v. United States, 116 F.Supp. 576, 127 Ct.Cl. 173, certiorari denied 348 U.S. 815, 75 S.Ct. 23, 99 L.Ed. 642, and it is the purpose of the requirement of filing a true copy of the assignment.

If a true copy is filed it would show whether the named assignee was acting as agent or trustee for anyone else participating in the financing. If it does not show that the named assignee is an agent or trustee, no one can acquire any rights under it *as against the United States* other than the person named.

It is true the majority opinion does not rest plaintiff's right to recover on the assignment to the bank and Suburban's letter to the bank, but it clearly implies plaintiff might recover on this basis in the absence of the bank's later reassignment. I disagree as to this, but I do agree that it might recover under the reassignment, except for the fraud which I think it attempted to practice on the defendant.

I agree Suburban's fraud is not imputable to plaintiff, but I think plaintiff itself attempted to practice a fraud.

When the defendant withheld payment of Suburban's vouchers A 418 and A 430, Chelsea, having learned that the Suburban contracts were being investigated by defendant, called in Suburban's officers, and they confessed the shortages. Chelsea urged them to make up the shortages and they promised to try to do so, but plaintiff does not claim they actually did so. At this point Chelsea's own gown definitely begins to trail in the mud. It withheld knowledge of this fraud from the bank, and withheld it also from the defendant, at the same time inquiring of defendant what had become of the money. On May 5, 1952, about six weeks after the last invoice had been submitted, Chelsea wrote the bank, the named assignee, the following letter:

"Re: Assignment of Government Contracts No. 23424, & No. 23426

"The above contracts were entered into by Suburban Frosted Foods Inc., 807 Washington Street, N.Y.C., the proceeds of which have been assigned to you, and discounted by you with our firm.

"To date only one invoice has been paid, leaving three invoices outstanding. The payment of these invoices have been overdue for some time now, and inquiries I have made to the disposition of these funds have given me no satisfaction.

"Since the government recognizes only you as the assignee of the above mentioned contracts, I hereby request of you to write the parties involved to determine the cause for delay in payment.

"The invoices involved are as follows:

"Contract No. 23424: Invoice No. A418 Dated March 12, 1952, $6,741.-00; Invoice No. A429 Dated March 26, 1952, $6,069.00.

"Contract No. 23426: Invoice No. A430 Dated March 26, 1952, $7,-864.50; Invoice No. A417 Dated March 12, 1952 was paid on March 26, 1952 in the amount of $15,936.27.

"Copies of the above invoices are in your files for future reference, I would appreciate your acting on this as soon as possible."

Without saying a word about the shortages, of which they were fully aware when this letter was written, they asked the bank why the invoices had not been paid—"to determine the cause for the delay in payment," are the exact words of their letter. In this letter they set out the amount of the invoices—not the amount Suburban, or it as assignee, was entitled to claim, but the amount Chelsea knew Suburban had fraudulently claimed. Chelsea wanted the bank to find out why these fraudulent invoices had not been paid.

Had Chelsea been honest and aboveboard and had told the defendant of the shortages, they would have been entitled to collect for the goods actually shipped and accepted by the defendant. But they were not honest and aboveboard. They did not disclose what they knew to be a fact, that the defendant was being overcharged; they withheld this knowledge, and tried to collect the full amount fraudulently claimed, or, at least, to find out why it had not been paid, which I think is tantamount to a request for payment. They did not need to request information as to the cause for the delay in payment; they knew the cause. They were not asking information; they were asking for payment; they were asking for payment for invoices they knew to be fraudulent.

I think this was a deliberate attempt to secure payment of vouchers it knew to be fraudulent.

My reluctance to find anyone guilty of an attempt to practice a fraud is largely overcome in this instance by plaintiff's apparent knowledge of prior fraudulent conduct on the part of Suburban in its dealings with defendant.

Between September 17, 1951, and December 18, 1951, Suburban and defendant entered into six contracts for frozen foods. All of them called for Grade B or better, except one, which called for Grade A. Chelsea financed these contracts. Chelsea had also financed the purchase by Suburban of various lots of *ungraded* frozen foods, which were caused to be released from public warehouses by Chelsea at the request of Suburban for the specific purpose of performing the contracts, which called for frozen foods, not ungraded, but of Grade B or better. On these contracts, Suburban deliberately shipped ungraded merchandise in lieu of the graded merchandise specified. Suburban then submitted to Chelsea, to be forwarded to the defendant, a false and fraudulent invoice under each of these contracts, requesting payment for the graded merchandise specified in each contract. Since it had financed Suburban's contracts with defendant, Chelsea must have known that they called for graded merchandise, and it knew

that ungraded merchandise was being shipped instead. Chelsea forwarded the invoices with this knowledge, actual or presumptive.

Section 2514 of Title 28 U.S.C. reads:

"§ 2514. Forfeiture of fraudulent claims.

"A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

"In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture." [62 Stat. 978.]

In my opinion Chelsea attempted to secure payment of vouchers which they knew to be false and fraudulent, and thereby attempted to practice a fraud against the United States in the "establishment or allowance" of the claim on which it now sues. Under the statute its claim should, therefore, be forfeited to the United States.

For the foregoing reasons I respectfully dissent.