THOMAS FUNDING CORP., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 370–85C.

United States Claims Court.

Sept. 12, 1988.

Mark Bradley Roth, Westbury, N.Y., Atty. of Record, for plaintiff.

Sharon Y. Eubanks, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

### REGINALD W. GIBSON, Judge:

#### Introduction

Thomas Funding Corp. (hereinafter plaintiff or Thomas Funding), a New York corporation, filed a complaint in this court on June 21, 1985, alleging, in essence, that the United States (defendant herein) wrongfully withheld payments due the plaintiff. Such payments, allegedly due, were the result of an assignment contract between plaintiff and a government contractor, i.e., Ferguson–Bryan & Associates, Inc. (FBA). The plaintiff's complaint seeks damages and a judgment in the amount of $287,865.61, plus interest and costs etc., "and for such other and further relief as the [c]ourt may deem just and proper."

In opposition, the defendant filed a motion for summary judgment maintaining that the court lacks jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 601 et seq., and the Tucker Act, 28 U.S.C. § 1491; that the plaintiff's complaint is barred by the doctrine of res judicata; and, furthermore, that, should the plaintiff prevail on those issues, a tax lien duly filed by the Internal Revenue Service has priority over the plaintiff's rights under the assignment contract. Thus, concludes defendant, the plaintiff is not entitled to recover the amount prayed for in its complaint under any hypothesis.

Inasmuch as we find no genuine issues of material fact, as discussed infra, the court grants the defendant's motion for summary judgment.

#### Facts

On December 10, 1982, the United States Agency for International Development (USAID or defendant herein) entered into contract # NEB–0042–C–00–3006–00 with the Small Business Administration (SBA) for the purpose of assisting the Egyptian Ministry of Social Insurance in implementing a more efficient system of data processing. Shortly thereafter, SBA subcontracted said work to Ferguson–Bryan & Associates, Inc. on or about December 14, 1982. FBA is a corporation headquartered in Washington, D.C. Under this subcontract, FBA was to deal directly with USAID, and assume the status thereunder of "contractor." Payment was to be made in installments upon the completion of specific portions of the job by FBA, which would then submit a voucher to USAID representing completion of such portion of the work and a demand for payment thereon.

On February 11, 1983, FBA assigned all of its rights to the proceeds under the contract with USAID to Thomas Funding Corp., a financial institution in the business of providing funds to government contractors.[1] Notice of this assignment was received by USAID on February 17, 1983.

Subsequent to said assignment, and the submission and payment of certain invoices, USAID began an investigation into the validity and accuracy of various labor charges on vouchers # 12 and # 13, which

---

**1.** "Sales and Assignment of Moneys Due or To Become Due.

I. The undersigned (hereinafter called the 'Assignor'), in consideration of the sum of $115,865.40 paid by Thomas Funding Corp., a financing institution (hereinafter called the 'Purchaser') to the Assignor, hereby sells, assigns and transfers to Purchaser ... any and all amounts now and/or hereafter due or owing to the As-

signor by the UNITED STATES OF AMERICA, or from any agency or department thereof ... under or pursuant to (i) the terms of that certain Contract ... [NEB–]0042–C–00–3006 heretofore entered into by the Assignor with the Government under date of 12/10/82...."

The assignment of contract proceeds was made pursuant to the Assignment of Claims Act, 31 U.S.C. § 3727, 41 U.S.C. § 15.

allegedly indicated that FBA had purposely overcharged USAID. Payment on these two vouchers and on voucher #14 was suspended and a stop work order was issued, which stood in effect for 90 days.

During the time the stop work order was in effect, FBA performed additional work under the contract and submitted voucher #15 requesting payment for that work. USAID refused to make payment on that voucher as well.

Upon a further investigation into the alleged overcharges on the part of FBA, USAID determined that there had in fact been an intentional overcharge and terminated for default the prime contract in issue on March 5, 1984. Approximately one week after the termination of said contract, i.e., March 13, 1984, the Internal Revenue Service served upon USAID a Notice of Levy on all property, rights to property, money, credits, and bank deposits in USAID's possession and belonging to FBA, who purportedly owed the IRS $527,878.62 in back taxes. On or after March 14, 1984, plaintiff was advised of the service of the foregoing Notice of Levy. With respect to the delinquent taxes of FBA, the IRS had previously duly filed four tax liens with the District of Columbia Recorder of Deeds between April 20, 1982 and December 19, 1983. Three of these liens, totalling $578,740.55, were filed in early 1982, long *before* FBA's assignment (February 11, 1983) of the contract proceeds to the plaintiff, Thomas Funding. Also two of those liens were filed prior to plaintiff's filing its Form UCC–1 financing statement on or about July 23, 1982. Given the foregoing liens filed by the IRS, USAID made no further payments to plaintiff who, on or about March 20, 1984, by telegram, claimed that its Form UCC–1 perfected the first lien on all proceeds due FBA by USAID under the contract. On said basis, plaintiff demanded that no payments be made to any party other than plaintiff.

Following a review of FBA's requests for payment on vouchers 12, 13, 14, and 15, USAID authorized payment on April 29, 1984, to the IRS in the amount of $77,545.54, *i.e.*, an amount representing the sum of payments due on vouchers 12, 13, and 14 minus an "outstanding local currency advance." By a prior letter to USAID dated April 2, 1984, Thomas Funding demanded payment of the balance due under the contract and therein threatened legal action. However, the contracting officer did not respond to this demand.

On May 9, 1984, FBA through counsel filed an appeal with the Armed Services Board of Contract Appeals (ASBCA) of the contracting officer's March 5, 1984 decision to terminate the contract. After filing its appeal with said board, FBA motioned for voluntary dismissal due to an alleged lack of funds. Consequently, the claim for wrongful termination was dismissed *with prejudice* by the board. Thomas Funding made no effort to take part in the case before the ASBCA.

By letter dated October 5, 1984, Thomas Funding filed a claim with USAID, pursuant to 41 U.S.C. § 605, demanding $287,865.61, which it claimed to be the balance of proceeds due under the contract. This claim was not certified. The letter contained a provision characterizing the document as a "contract claim" in compliance with the Contract Disputes Act, 41 U.S.C. § 605. USAID responded to this demand by letter dated December 19, 1984, and advised that Thomas Funding was *not* a party to the government contract in question, thus not a contractor, and, therefore, could not bring a claim under the Contract Disputes Act. Thomas Funding then filed a complaint in this court on June 21, 1985, alleging that FBA, the assignor, has performed work under the contract worth $287,865.61, and that USAID has wrongfully withheld payments due to Thomas Funding. The United States has now moved for summary judgment.

### Contentions of the Parties

#### A. Defendant

The defendant has moved for summary judgment claiming, first, that the plaintiff lacks privity of contract necessary to bring an action under the Tucker Act. Privity is lacking, argues defendant, because plaintiff did not enter into a contract with the

United States, but instead received an assignment of proceeds under a government contract in which the defendant was *not* a party. As a corollary argument, defendant also claims that the plaintiff, because it was not a party to a government contract, cannot assume the status of "contractor" as that term is statutorily defined under the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.*

Secondly, the defendant asserts that the doctrine of res judicata bars plaintiff's breach claim because *the contractor* (FBA) has already brought an action against defendant for wrongful termination of the contract and that action was later voluntarily dismissed by FBA *with prejudice.* Therefore, defendant maintains, plaintiff cannot show that the defendant has wrongfully withheld money due to either FBA or Thomas Funding as a result of work performed by the contractor.

Lastly, defendant includes three 1982 Notices of Federal Tax Liens and a 1984 Notice of Levy from the IRS in its supporting submissions, and points out that a portion of the money claimed by the plaintiff under the Assignment of Claims Act has already been properly paid to the IRS, which has priority over plaintiff's proceeds assignment, and that the remaining balance legally due IRS under such levy substantially exceeds the amount claimed by the plaintiff. The defendant concludes that, given the foregoing circumstances, the plaintiff, under any legal theory, is not entitled to any recovery in this action.

### B. *Plaintiff*

Thomas Funding, Inc., the assignee of the government's contract with FBA and plaintiff herein, in response to defendant's motion for summary judgment, avers a plethora of bases allegedly justifying the action herein. First, plaintiff claims that the defendant is precluded from raising any objections to this court's jurisdiction. The plaintiff rests its argument on a previous U.S. Claims Court denial of the government's motion for summary judgment in a separate case involving a different contract and assignor.

Plaintiff further argues that here privity of contract is not necessary, to the extent that assignees have in the past been allowed to bring actions both in this court and its predecessor, the Court of Claims, against the United States to collect monies due.

In furtherance of the foregoing, plaintiff also makes two alternative arguments. First, it argues that privity of contract is unnecessary in this case because it (plaintiff) is an intended third-party beneficiary of the government's contract with FBA. Secondly, says plaintiff, privity exists between itself and the United States through an implied-in-fact contract in which the latter's acceptance of the assignment was in consideration of plaintiff's offer to provide funds for the contractor. For all of these reasons, the plaintiff asserts jurisdiction under the Tucker Act. In addition, plaintiff argues that as a party to a government contract by virtue of a valid assignment, this court also has jurisdiction under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.*

In response to the defendant's argument that plaintiff's claim is barred by res judicata, plaintiff, in its opposition brief, states that the doctrine is not applicable because the case by FBA against the United States was not "on the merits," did not involve litigation of an identical issue, and was not between these same parties or their privies.

Lastly, as to the priority of the federal tax liens, the plaintiff argues that because the assignor did not have an interest in the proceeds from the contract at the time the federal tax liens were *filed, i.e.,* the work had not yet been performed, *plaintiff's* assignment has priority over said tax liens. Additionally, plaintiff avers that defendant knew of the prior filed federal tax lien and, thus, had a duty to immediately advise plaintiff of the worthlessness of the collateral. By failing to so inform, plaintiff argues, defendant breached its duty and is liable to it notwithstanding the priority of the federal tax liens. Consequently, according to the plaintiff, the defendant is liable to it for the money paid to the IRS on the levy ($77,545.54).

*Scope of the Court's Opinion*

In deciding this motion for summary judgment, the court must, therefore, determine three broad issues: (i) whether the plaintiff, as an assignee to a government contract under the Assignment of Claims Act, 31 U.S.C. § 3727, 41 U.S.C. § 15, has privity of contract with the United States for purposes of asserting a claim under the Tucker Act, 28 U.S.C. § 1491; (ii) whether such assignee to a government contract is a "contractor" as that term is defined under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.*, and, as such, entitled to bring a breach claim under that statute; and (iii) whether a federal tax lien on the assignor's property has priority over the plaintiff's assignment of the proceeds under the government contract and bars it from recovering under this claim where the IRS filed three tax liens, which far exceed the amount of damages claimed by plaintiff, *prior* to the assignment by the prime contractor to the plaintiff and the filing of Form UCC–1.

*Discussion*

## I. *Jurisdiction*

We now address plaintiff's contention that jurisdiction is conferred upon this court by the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act (CDA), 41 U.S.C. §§ 601 *et seq.* With respect to the foregoing, defendant avers that—(i) there is a want of privity; (ii) plaintiff is not a contractor under the CDA; and (iii) moreover, its letter filed with the contracting

officer is not a claim within the contemplation of that statute.

## A. *The Tucker Act, 28 U.S.C. § 1491*

■ Notwithstanding plaintiff's nebulous averment that in a breach action, as it curiously asserts here, privity of contract is not required to be shown with the United States in order to recover, we hold that plaintiff may not maintain a breach action on these facts under 28 U.S.C. § 1491.[2] As has long been recognized in government contract law, privity of contract is an indispensable prerequisite to the maintenance of a suit in this court against the government under the Tucker Act. *See Erickson Air Crane Co. v. United States,* 731 F.2d 810 (Fed.Cir.1984) (citing *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550–52 (Fed.Cir.1983)). "The government consents to be sued only by those with whom it has privity of contract...." *Erickson,* 731 F.2d at 813. In both *Erickson* and *Johnson Controls,* a subcontractor was precluded from suing the government because it could not establish privity of contract, which the courts found to be dispositive.

Although these cases both involve the issue of whether a subcontractor, as opposed to an assignee, has privity of contract with the government, the holding in each applies to the present situation equally well because the distinction is without a significant difference. *See Produce Factors Corp. v. United States,* 199 Ct.Cl. 572, 467 F.2d 1343 (1972). In *Produce Factors,* as in the present case, an assignee attempted to establish privity of contract, against the United States, through a valid

---

**2.** The plaintiff, in its opposition brief, also argues that defendant is collaterally estopped from denying jurisdiction. A court, however, always has—"jurisdiction to determine its jurisdiction." *See Vecchione v. Wohlgemuth,* 426 F.Supp. 1297, 1309 (E.D.Pa.), *aff'd,* 558 F.2d 150 (3rd Cir.), *cert. denied, Beal v. Vecchione,* 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977); RUSCC 12(h)(3) (holding that a court shall dismiss an action whenever it appears by suggestion of the parties that the court lacks jurisdiction). Furthermore, when the first court to decide the issue lacked subject matter jurisdiction, collateral estoppel will bar a plea of want of jurisdiction. *See Cullen v. Margiotta,* 811

F.2d 698, 732 (2d Cir.1987). *See generally* Restatement (Second) of Judgments § 26(1)(c) (1982); *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1983) (prohibiting the use of non-mutual, offensive collateral estoppel against the government).

This court, therefore, cannot, and will not, permit plaintiff to use collateral estoppel as a free pass into a court that does not have subject matter jurisdiction over its claim. As stated in *Vecchione,* "a judgment that issues without subject matter jurisdiction is void, and the principle of [collateral estoppel] does not of its own force breathe vitality into the judgment." 426 F.Supp. at 1309 n. 26.

assignment of proceeds arising from a government contract. The court rejected this argument, stating that an assignment "[cannot], and did not, create any contractual relationship between [the assignee] and the United States." *Id.* at 581, 467 F.2d at 1348.

As an assignee under the Assignment of Claims Act, the plaintiff herein simply does not acquire privity of contract with the government in a separate contract with its assignor, which is necessary in order for it to maintain a breach action in this court under the Tucker Act. The plaintiff tortuously attempts to circumvent this fundamental requirement by arguing that privity of contract between it and the government was established through an implied-in-fact contract that was formed when the government acknowledged, or, as plaintiff would have it, "accepted" plaintiff's "offer" to lend the prime contractor funds in exchange for the assignment of the proceeds. Yet, as *Produce Factors* makes clear:

> [T]he plaintiff, whose relationship with the United States arose *only* because of its status as an assignee under the Assignment of Claims Act, as amended, did not have privity of contract *or any contractual relationship* [even implied] with the Government. Therefore, its *breach of contract action* cannot be maintained. Plaintiff had only the rights of an assignee of Government contract proceeds under the assignment statute.

*Produce Factors*, 199 Ct.Cl. at 578, 467 F.2d at 1347 (emphasis added).

It is hornbook law that all the elements of an expressed contract must exist in order to create an implied-in-fact contract. For example, including but not limited to the requisite privity, a meeting of the minds and adequate consideration are the fundamental linchpins to such a contract. It is sufficient to say that plaintiff's implied-in-fact contract argument is entitled to short-shrift inasmuch as it totally fails to carry its burden in that regard. *See Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 763, 428 F.2d 1241, 1255

(1970); and *Diamond Manufacturing Co. v. United States*, 3 Cl.Ct. 424, 426 (1983).

Plaintiff also makes an alternative argument, seeking to invoke Tucker Act jurisdiction, to the effect that it was an intended third-party beneficiary of the prime contract (NEB–0042–C–00–3006–00) between the government and plaintiff's assignor (FBA), and it therefore has the right to bring an action against the government thereunder, which, it claims, is the promisor. The plaintiff rests this conclusion on the fact that the defendant knew of the valid assignment to plaintiff in that it was served with a copy thereof on or about February 11, 1983, and also knew that the prime contractor (FBA), according to plaintiff, would not have been able to fulfill its obligations under the contract with the government absent the financing-assignment arrangement.

The foregoing averments hardly make the plaintiff an *intended third-party beneficiary* with enforceable breach rights against the United States. In order for one to have the recognized status of a third-party beneficiary of a government contract to which it is not a party, the contract with the government must evidence not only a *clear* intention to confer a benefit to that third party, but also an intention to give that third party the right to maintain an action against the government in order to protect the resulting benefit. *See Baudier Marine Electronics v. United States*, 6 Cl.Ct. 246 (1984) (citing *German Alliance Insurance Co. v. Home Water Supply Co.*, 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912); *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 697–98 (1980); *Orchards v. United States*, 4 Cl.Ct. 601, 609–12 (1984)), *aff'd*, 765 F.2d 163 (Fed.Cir.1985).

In the case at bar, the plaintiff has not even alleged that the government knew of its existence at the time the prime contract was executed. The assignment occurred nearly three months *after* the execution of the prime contract, which contained no reference to the plaintiff whatsoever. While notice to the defendant of the assignment itself requires the defendant to make payments to the assignee, *see* 31 U.S.C.

§ 3727, 41 U.S.C. § 15, this obligation arose from a statute coupled with an entirely separate contract to which the defendant was *not* a party in any sense. Simply stated, the plaintiff has neither alleged nor established the elements necessary to show that it is a third-party beneficiary, and we so find.

Pertinent to the overall privity issue, underlying plaintiff's alternative implied-in-fact and third-party beneficiary contract contentions, the court in *Produce Factors*, 199 Ct.Cl. at 580, 467 F.2d at 1348, further states that:

> While the assignee lending institution indirectly benefits the Government through financing the contractor's performance, such indirect benefits do not serve to create privity of contract with the United States.

B. *The Contract Disputes Act, 41 U.S.C. §§ 601 et seq.*

■ Plaintiff also, in addition to the foregoing, asserts jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.* We hold, however, that because the plaintiff is not a "contractor," as discussed *infra*, it cannot maintain its action in this court under that statute.

Section 609 of Title 41 U.S.C. states that claims against the government can only be brought by a "contractor." °*See* 41 U.S.C. § 609. A "contractor" is defined in section 601 as "a party to a *government* contract other than the government." 41 U.S.C. § 601(4). The defendant urges that because the plaintiff was not a "party" to the contract in question, and that only the prime contractor and the government were, the plaintiff is clearly not a "contractor" for purposes of the CDA. Thus, defendant argues no breach claim for damages, on these facts, may be maintained in this court.

While this view somewhat oversimplifies the issue, it is essentially correct, for again the requirement of privity of contract must be shown for all parties attempting to maintain a suit as a contractor against the government under the Contract Disputes Act of 1978. *See Erickson*, 731 F.2d at 813; *Johnson Controls*, 713 F.2d at 1548–52. In short, the basic tenet of government contract law that the government consents to be sued only by those (*i.e.*, a contractor) with whom it has privity of contract, although exceptions exist within very limited circumstances, is emphatically embodied in the Contract Disputes Act. *See Erickson*, 731 F.2d at 813. As discussed in the previous section, neither the prime contract nor the contract of assignment was a tripartite agreement. To the contrary, both were separate and distinct subject matter contracts. That is to say, plaintiff was not a party to the former contract, and the government was not a party to the latter. Thus, under no hypothesis can it be said that plaintiff herein was in privity with the United States under either contract.

■ To allow plaintiff, against this background, to maintain an action against the government under the CDA would disserve the policy considerations behind said Act: to provide a comprehensive, efficient system for adjudicating *contract* claims against the government, and to provide a single point of contact between the contracting officer and the *contractor*. *See* S.Rep. No. 1118, 95th Cong., 2d Sess. 16, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5235, 5250. In subject case, the prime contractor (FBA) has already brought an action for breach against the government before the ASBCA, which, at the assignor's motion, was dismissed by the board with prejudice on or about May 16, 1985. One can plainly see, on this record, that the policy of providing a single point of contact between the *contractor* and the *government* would be lost if the government, after successfully litigating a suit brought against it by a contractor, then had to face various breach claims brought by the *contractor's assignee.*[3]

---

**3.** The defendant, as an additional ground for summary judgment, urges this court to bar the plaintiff's suit under the doctrine of res judicata.

We choose not to do so on that ground because the defendant had notice of the assignment to the plaintiff, and could therefore have joined or

Therefore, because the plaintiff does not have the necessary privity of contract relationship with the defendant, i.e., as a "contractor," and because allowing it to proceed in place of the prime contractor would undermine the purpose of the Contract Disputes Act, we hold that this court does not have jurisdiction under that Act to entertain plaintiff's complaint.

### C. *The Assignment of Claims Act, 31 U.S.C. § 3727, 41 U.S.C. § 15*

■ As has long been recognized by this court and its predecessor, the Court of Claims, an assignee to the proceeds of a government contract under the Assignment of Claims Act is entitled to sue the government in order to recover payment for work *performed* by the contractor. *See Merchants National Bank v. United States,* 231 Ct.Cl. 563, 689 F.2d 181 (1982); *Tuftco Corp. v. United States,* 222 Ct.Cl. 277, 614 F.2d 740 (1980); *First National City Bank v. United States,* 210 Ct.Cl. 375, 537 F.2d 426, *vacated,* 212 Ct.Cl. 357, 548 F.2d 928 (1977); *Florida National Bank v. United States,* 4 Cl.Ct. 396 (1984); *Maryland Small Business Development Financing Authority v. United States,* 4 Cl.Ct. 76 (1983); *Produce Factors Corp. v. United States,* 199 Ct.Cl. 572, 467 F.2d 1343 (1972); *Wyoming National Bank v. United States,* 154 Ct.Cl. 590, 292 F.2d 511 (1961); *Chelsea Factors, Inc. v. United States,* 149 Ct.Cl. 202, 181 F.Supp. 685 (1960); *Arlington Trust Co. v. United States,* 121 Ct.Cl. 32, 100 F.Supp. 817 (1951). This is not to say, however, that the assignee may bring an action for breach of contract against the government when there is no privity of contract between the two parties. *See Produce Factors,* 199 Ct.Cl. at 580, 467 F.2d at 1348. Rather, an assignee under such circumstances may only bring a suit against the government for wrongful payment to a third party, and may not maintain an action for breach of contract in this court.

Under the Assignment of Claims Act, once notice of the assignment is duly given to the government, it has a duty to make payments directly to the assignee for work performed by the assignor. In this case, the government received notice of the assignment to Thomas Funding from FBA on February 17, 1983, from which time it owed a duty to Thomas Funding to make payments directly thereto. As any failure to fulfill this duty is an actionable offense on the part of the government, this court has jurisdiction under the Assignment of Claims Act, 31 U.S.C. § 3727, 41 U.S.C. § 15, only for plaintiff's claim for wrongful payment. The Act did not give this court jurisdiction to entertain actions in breach of contract brought against the government by assignees.

In the instant case, Thomas Funding has in fact brought two different claims against the government: the first alleging non-payment of $210,330.07, and the second alleging wrongful payment of $77,545.54 to the Internal Revenue Service. We hold, therefore, that this court has jurisdiction under the Assignment of Claims Act, 31 U.S.C. § 3727, 41 U.S.C. § 15, only to the extent that Thomas Funding alleges wrongful payment to the IRS, i.e., $77,-545.54; and this court does not have jurisdiction over the remaining claim of $210,-330.07, as that claim would necessarily involve the determination of whether the government's termination of the prime contract was legally permissible—what the court in *Produce Factors* termed "performance aspects" of the contract and refused to hear. *See Produce Factors,* 199 Ct.Cl. at 580–81, 467 F.2d at 1348.

### II. *Priority of the IRS Tax Liens*

■ Notwithstanding the existence of jurisdiction in this court, *supra,* we are

---

interpleaded it in the first action. When the obligor (defendant in this case) has notice of an assignment by the assignor, and the assignee is not joined in a suit by the assignor against the obligor, a judgment for or against the obligor will not bar a later suit by the assignee. *See In re Fine Paper Litigation State of Washington,* 632 F.2d 1081 (3d Cir.1980); Restatement (Second) of Judgments § 55, Comment A (1980).

In this case, the defendant knew as of February 17, 1983, of FBA's assignment of the proceeds to the plaintiff. When faced with the suit by FBA on May 9, 1984, it could have required that the present plaintiff, Thomas Funding, be made a party to the action through joinder or interpleader. In any event, it is unnecessary to address this issue inasmuch as this case may be appropriately resolved on another basis.

compelled, nevertheless, to grant defendant's motion for summary judgment. This is so because the IRS has filed with the Recorder of Deeds for the District of Columbia four Notices of Federal Tax Liens, two of which (aggregating $465,464.36) were filed *prior* in point of time to plaintiff's filing its Form UCC–1 financing statement. The following evidences the foregoing:

| Stamped Filing Date | Document | Amount | Defendant's Appendix |
|---|---|---|---|
| | Notice of Federal | | |
| 4/21/82 | Tax Lien | $377,989.43 | 88 |
| 4/27/82 | " | 87,474.93 | 89 |
| 7/23/82 | " | 113,276.19 | 90 |
| 12/?/83 | " | $ 13,497.55 | 91 |

(Pltf's Ex. E, p. 54). Form UCC–1 contains a circled stamp thereon which is illegible and a scripted writing indicating—"Recorder of Deeds 7/23/82," apparently denoting that it was filed thereat on said date. Given that date to be accurate, it means that plaintiff filed its UCC–1 financing statement approximately six and one-half (6½) months *prior* to the date it entered into the assignment with FBA on February 11, 1983 (Pltf's Ex. A2, p. 31). Moreover, on or about March 13, 1984, defendant (USAID) received an IRS Notice of Levy (Deft's App. 87) executing on any and all monies in its possession due to FBA. As a result of the duly filed liens and levy, *supra*, USAID released $77,545.54 to the IRS on or about March 29, 1984, which was the total amount then held and due to FBA under the contract, assigned to plaintiff on February 11, 1983 (Deft's App. 97). In short, the foregoing establishes that the IRS liens and levy have priority over plaintiff's subsequent Form UCC–1 financing statement and, as a consequence, plaintiff cannot prevail on this issue.

The 1954 Internal Revenue Code, section 6321, is clear on this point. Therein it provides that upon a taxpayer's refusal to pay its taxes, a lien arises in favor of the United States "upon all property and rights to property, whether real or personal, belonging to such person." I.R.C. § 6321. Thus, upon the filing of such a lien and levy, as here, with the proper county or, as in this case, the Recorder of Deeds in Washington, D.C., all creditors are put on constructive notice of the lien's existence; and all *subsequent* creditors (as plaintiff herein) of the delinquent taxpayer take an interest in plaintiff's property subject to the tax lien. *See, e.g., Atlantic National Bank v. United States*, 210 Ct.Cl. 340, 536 F.2d 1354 (1976).

Plaintiff does not dispute the broad general rule of first-in-time, first-in-right, but instead postures two arguments seeking to defeat defendant's motion for summary judgment by averring that: (i) there are two genuine issues of material fact; and (ii) the plaintiff's perfected security interest (*i.e.*, the UCC–1) has priority over the federal tax liens notwithstanding the fact that the latter were filed prior in time to the former.

With respect to the existence of genuine issues of material fact, plaintiff argues first that there is a factual issue as to the *total amount due* by USAID, under the FBA contract, as assigned to plaintiff and such issue cannot be resolved by summary judgment. Presumably, plaintiff is attempting to subtlely raise breach issues, which it cannot; and further it is tacitly arguing that perhaps it is entitled to show that amounts are due by USAID under the assigned contract which exceeds the aggregate amounts of the *perfected* liens and levy.

It is hornbook law that in order for the non-movant to defeat a motion for summary judgment, it must show that there exists one or more "genuine issues of material fact." *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). The postured issue must not only be *material* but also *genuine*. That is to say, both criteria must be met. A "material" fact, in this context, is customarily defined as one that will make a difference, or contribute to the collective evidence making that difference, in the results of the case.

The incontrovertible evidence regarding the amount due under the prime contract is as follows: (i) plaintiff's contract of assignment shows that it advanced $115,865.40 to FBA, its assignor, and that $193,109.00 is

the anticipated aggregate amount due or to become due under the prime contract (Deft's App. 60); (ii) IRS liens perfected *prior* in time to plaintiff's security interest aggregate $465,464.36 (Deft's App. 88, 89, 90); (iii) the IRS levy served on USAID demanded all money etc., owing to FBA by USAID in the *total amount of $527,878.62* (Deft's App. 87); and (iv) plaintiff's complaint prayed for *only $287,865.61*. The foregoing establishes, unequivocally, that the IRS liens, prior in time, exceed by at least $177,598.75 ($465,464.36—$287,-865.61) any amount that plaintiff might arguably be entitled to from USAID under the assignment of proceeds of the prime contract. Against this background, we simply say that any fact regarding the amount due stemming from the prime contract is *neither* a *genuine* issue nor a *material* fact, for purposes of defendant's motion for summary judgment, because the IRS liens and levy totally absorbed any amount otherwise due plaintiff pursuant to the assignment.

Next, and finally, plaintiff argues, in its effort to posture a genuine issue of material fact, that USAID visited a fraud on it when it failed to warn it (plaintiff), upon receipt of notice of the assignment of the proceeds on or about February 17, 1983, that plaintiff's security interest was worthless inasmuch as USAID was then aware of the existing federal tax liens previously perfected in April 1982. Plaintiff argues that in view of defendant's superior knowledge of the existence of said federal tax liens, it should have immediately advised plaintiff so as to permit it to protect itself by electing *not* to advance any additional funds under the assignment. In support of this position, plaintiff relies on certain dicta in *Produce Factors*, 199 Ct.Cl. at 582, 467 F.2d at 1349, *cited in Atlantic National Bank v. United States*, 210 Ct.Cl. 340, 348, 536 F.2d 1354, 1359 (1976), wherein the court states that:

> If at the time it (Government) receives notification of an assignment, the Government knows that the assignee's collateral is worthless, the Government must convey that information to the assignee so that he will not advance funds

on the strength of proceeds that will never come due.

*Atlantic National Bank*, 210 Ct.Cl. at 348, 536 F.2d at 1359, further teaches that to estop and hold the government liable on the foregoing rule, *each* of four separate elements *must* be present. One of these elements is that the party asserting estoppel must be ignorant of the true facts. *See id.* (citing *Emeco Industries, Inc. v. United States*, 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973); *United States v. Georgia–Pacific Co.*, 421 F.2d 92, 96 (9th Cir.1970)). Here, it is clear beyond cavil that plaintiff, as a matter of law, cannot set itself up as being ignorant of the IRS tax liens, when filed, for the simple reason that the cited authorities provide that it had constructive notice of each lien:

> The purpose of the filing of a notice of Federal tax lien is to give constructive notice. A purchaser is charged with constructive notice of all a person of ordinary intelligence and diligence would have discovered by an examination of the index to Federal tax liens in the appropriate local office. [citation omitted.]

> \*    \*    \*    \*    \*    \*

> Once it is established that plaintiff was chargeable with constructive notice, that notice has the same legal significance as actual notice.

> \*    \*    \*    \*    \*    \*

> ... and either constructive notice or actual notice is binding independently of the other.

*Atlantic National Bank*, 210 Ct.Cl. at 348–49, 536 F.2d at 1359.

Plaintiff herein is in the business of advancing finances for government contractors experiencing cash-flow problems to enable them to timely meet their contractual obligations. A person in such business exercising ordinary intelligence and diligence, and recognizing the substantial risks attending the conduct of business with such contractors, would certainly proceed with caution and check public records to notate any and all pre-existing viable liens. Had plaintiff utilized reasonable diligence (*prior* to executing the assignment agreement on

or about February 11, 1983, by checking the recorder of deeds and/or other public records where federal tax liens are required to be filed), it would have had actual knowledge of the existing liens inasmuch as they were filed many months (*i.e.,* April and July 1982) prior to the time the assignment was executed. Plaintiff utilized uncanny diligence by filing its Form UCC–1 financing statement on or about July 23, 1982. Said filing occurred a little over six months prior to executing the assignment. Thus, we hasten to observe that it strains credulity that plaintiff failed to exercise equal diligence and checked for existing federal tax liens for the same reason it filed the Form UCC–1, *i.e.,* to protect its interest.

We are compelled, therefore, to charge plaintiff with constructive notice of the pre-existing federal tax liens. So charged, we hold that plaintiff in effect had actual knowledge of the pre-existing federal tax liens, which, as a consequence, obviates any genuine issue of material fact regarding defendant's alleged fraudulent failure to warn plaintiff of the worthlessness of its security interest.

Plaintiff's last contention, which is apparently an afterthought, urges the position upon this court that its security interest (Form UCC–1 filed July 23, 1982) has priority over the two *previously filed* federal tax liens (*i.e.,* April 21 and 27, 1982). The tortuous scenario of plaintiff reasons as follows: (i) at the filing of the federal tax liens in April 1982, neither the primary contract between FBA and USAID (December 10, 1982) nor the assignment agreement (February 11, 1983) of the proceeds between Thomas Funding Corp. and FBA had been entered into; (ii) FBA had no interest in any monies under said contract or property interest therein in April 1982, thus in April 1982 there was no property in USAID's possession belonging to FBA to which said lien could attach; (iii) since Thomas Funding filed its security financing statement, Form UCC–1, on July 23, 1982, a point prior in time to the execution of the prime contract (December 10, 1982), the in-place security interest gave Thomas Funding a preferred position over the federal tax lien although the latter was filed prior in time; and (iv) thus, when monies were earned, and due and payable by USAID under the assigned contract, they were instantaneously encumbered by plaintiff's previously perfected security interest. Not surprisingly, no pointed authorities were cited to by plaintiff for this specious position.

*Atlantic National Bank,* 210 Ct.Cl. at 343, 536 F.2d at 1356 (citing *Texas Oil and Gas Corp. v. United States,* 466 F.2d 1040, 1052 (5th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973)), teaches that "a federal tax lien attaches immediately to after-acquired property [of the taxpayer] without any further action required by the Government." A case on all fours with the case at bar is *Seaboard Surety Co. v. United States,* 306 F.2d 855 (9th Cir.1962), *cited in Atlantic National Bank,* 210 Ct.Cl. at 344–45, 536 F.2d at 1357, which holds as follows:

> [T]he taxpayer was awarded a Government contract on December 31, 1956. On March 2, 1957, a trust agreement was executed assigning the proceeds of the contract to a bank. Prior to the date of the [assignment] ... the Government had a fully perfected tax lien on all property and rights to property of the taxpayer. The [*Seaboard* ] court stated at 859:
>
> > * * * These tax liens attached immediately to all rights of taxpayer under the government contract awarded December 31, 1956, including payments whenever earned. * * * [T]he [assignment] ... of March 2, 1957 could not displace the tax liens, which had already attached to taxpayer's property rights in the contract.
>
> The fact that taxpayer's rights under the contract were dependent upon its performance did not affect the tax liens. * * *

Given the foregoing, we hold that because plaintiff's secured financing statement, Form UCC–1, was filed (July 23, 1982) *after* the federal tax liens (April 21 and 27, 1982), by some two months (one day after would be equally fatal), plaintiff cannot prevail on the priority issue.

*Conclusion*

If the contractor/assignor (FBA) was entitled to monies from USAID under the contract, then Thomas Funding Corp., the assignee, would succeed to those rights. However, our situation at bar mirrors *Wyoming National Bank v. United States,* 154 Ct.Cl. 590, 594–95, 292 F.2d 511, 514 (1961), wherein our predecessor court held:

> [I]nasmuch as the contractor owed the government in this respect much more than it had coming, clearly the contractor was entitled to nothing. Consequently, the assignee would also be entitled to nothing.

*A fortiori,* IT IS HEREBY ORDERED that—the plaintiff here at bar shall take nothing; the Clerk shall dismiss the complaint; and the plaintiff shall be assessed costs.